[Cite as *State v. Murphy*, 2019-Ohio-290.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

STATE OF OHIO

    Appellee

v.

CEDRIC MURPHY

    Appellant

C.A. No.    28808

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CR-2017-01-0069

DECISION AND JOURNAL ENTRY

Dated: January 30, 2019

CARR, Judge.

{¶1}     Defendant-Appellant Cedric Murphy appeals from his convictions in the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2}     Late in the evening of November 5, 2016, then eighteen year old M.P. went to an Akron nightclub with three other women. When they returned to her one friend's home in the early morning hours of November 6, 2016, M.P. found herself without a ride back to her dorm at the University of Akron. She contacted a friend for a ride, however, that friend failed to show up. Ultimately, M.P. decided to attempt to find her way home on foot. She met a man who gave her mace and a flashlight. That man told her she could follow him back to the university. However, when the man saw a vehicle in the area, he told M.P. that she should see if that person could give her a ride since that person had a car. That person would later be identified as Murphy. M.P. got into the vehicle with Murphy and as soon as he began driving, he began to

sexually assault her. M.P. was able to unlock the doors, jump out of the vehicle, and scream for help.

{¶3} As a result, in January 2017, Murphy was indicted on one count of kidnapping in violation of R.C. 2905.01(A)(4) with a sexual motivation specification and a sexually violent predator specification, one count of abduction in violation of R.C. 2905.02(A)(2), and two counts of gross sexual imposition in violation of R.C. 2907.05(A)(1). Murphy waived his right to a jury trial, and the matter proceeded to a bench trial.

{¶4} At the beginning of the second day of trial, after M.P had already testified, Murphy's counsel moved for a mistrial explaining that, after the first day of trial, the prosecutor had disclosed a detective's report about a witness statement and a recorded witness statement that had not been in the discovery packet. That witness, C.C., had been with M.P. on the night of the attack. The State responded that it was only made aware of the evidence shortly before it disclosed it to the defense. The trial court denied the motion for a mistrial but ordered that the statement be played as part of the State's case and that the defense be granted a continuance to try to locate and subpoena the witness. The trial court also indicated it would allow the defense to recall M.P. to the stand.

{¶5} The witness was located and the defense called her to the stand in its case. Additionally, the defense recalled M.P. and her mother to the stand. Thereafter, the trial court denied the defense's renewed motion for a mistrial. The trial court issued a written decision finding Murphy guilty of the charges. A separate hearing was held on the sexually violent predator specification, after which the trial court found the defendant guilty of that specification. Murphy was sentenced to ten years to life imprisonment with parole eligibility after ten years for kidnapping and one year on each of the two counts of gross sexual imposition, which were to run

concurrent to the kidnapping sentence. The trial court found that the crime of abduction and kidnapping were allied offenses and thus did not impose a sentence on the abduction charge.

{¶6} Murphy has appealed, raising three assignments of error for our review.

II.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING DEFENDANT[']S MOTION FOR MISTRIAL[.]

{¶7} Murphy argues in his first assignment of error that the trial court erred in denying his motion for a mistrial. Murphy maintains that the trial court cited the wrong portion of Crim.R. 16 in denying the motion, thereby supporting that the trial court abused its discretion.

{¶8} As discussed above, Murphy's counsel moved for a mistrial after the prosecution failed to disclose a detective's report concerning a witness statement by C.C. and the recorded statement of that witness. Notably, the prosecution asserted that it did not possess that evidence until shortly before it provided it to the defense.

{¶9} "[A] trial court has discretion in determining a sanction for a discovery violation. This Court, therefore, reviews the trial court's decision in that regard for an abuse of discretion." (Internal quotations and citations omitted.) *State v. Huguley*, 9th Dist. Summit No. 28322, 2017-Ohio-8300, ¶ 15. "Criminal Rule 16 governs discovery in a criminal case. The purpose of the discovery rule is 'to provide all parties in a criminal case with the information necessary for a full and fair adjudication of the facts, to protect the integrity of the judicial system and the rights of defendants, and to protect the well-being of witnesses, victims, and society at large.'" *Id*. at ¶ 16, quoting Crim.R. 16(A).

{¶10} Crim.R. 16(L)(1) states that, "[i]f at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an

order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances." "A mistrial is a severe sanction used in those cases where a fair trial is no longer possible." (Internal quotations and citations omitted.) *Huguley* at ¶ 17.

**{¶11}** "[A] trial court must inquire into the circumstances surrounding a discovery rule violation and, when deciding whether to impose a sanction, must impose the least severe sanction that is consistent with the purpose of the rules of discovery * * * ." *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, syllabus, quoting *Lakewood v. Papadelis*, 32 Ohio St.3d 1 (1987), paragraph two of the syllabus. "[T]hree factors that should govern a trial court's exercise of discretion in imposing a sanction for a discovery violation committed by the prosecution[ are :] * * * (1) whether the failure to disclose was a willful violation of Crim.R. 16, (2) whether foreknowledge of the undisclosed material would have benefited the accused in the preparation of a defense, and (3) whether the accused was prejudiced." *Darmond* at ¶ 35; *see also Huguley* at ¶ 18.

**{¶12}** While it is true that the trial court referenced Crim.R. 16(B)(1) and (E)(3) in its discussion denying the renewed motion for a mistrial, from the context it is apparent that the trial court was referring to a prior version of the rule. Notably, "Crim.R. 16(L)(1) is identical to former Crim.R. 16(E)(3) in detailing a trial court's authority to issue orders in the wake of a party's failure to comply with discovery obligations, and in particular provides that the trial court may issue any order it deems just under the circumstances." (Internal quotations and citations omitted.) *Darmond* at ¶ 33. Thus, we cannot say that the trial court's citation to the prior version of the rule inherently indicates an abuse of discretion.

{¶13} Instead, we can only conclude that the trial court did not abuse its discretion in denying Murphy's motion for a mistrial. It is apparent that the trial court believed the prosecution's explanation for the delay in the disclosure of the evidence as it found no willful discovery violation by the State. Nonetheless, as a sanction, the trial court ordered the State to play the newly discovered recorded statement at trial as part of its case and also granted the defense what amounted to a nearly three week continuance so the defense could locate the witness and subpoena her. The defense was able to locate the witness, who testified in the defense's case. In addition, the defense recalled M.P. and her mother to the stand to address the areas in which M.P.'s testimony was inconsistent with that of the new witness. In light of the foregoing, the trial court concluded that the defense had not suffered prejudice from its delayed receipt of the evidence and that the continuance had been the appropriate sanction. We conclude that the trial court's sanction was not an abuse of discretion. The trial court thoughtfully considered the issue and the rights of both sides. Under the circumstances, we cannot say that denying the motion for a mistrial and instead providing the defense with a continuance was an unreasonable sanction. *See Darmond* at ¶ 40 (approving of a continuance as "feasible alternative" to a dismissal).

{¶14} Murphy's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT'S CONVICTION OF APPELLANT OF KIDNAPPING, AS CONTAINED IN COUNT 1 OF THE INDICTMENT WITH SEXUAL MOTIVATION SPECIFICATION ONE TO COUNT ONE; GUILTY OF THE CRIME OF ABDUCTION, AS CONTAINED IN COUNT 2 OF THE INDICTMENT; AND GUILTY OF THE CRIME OF GROSS SEXUAL IMPOSITION, AS CONTAINED IN COUNTS 3 AND 4 OF THE INDICTMENT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE[.]

## ASSIGNMENT OF ERROR III

THE TRIAL COURT'S CONVICTION OF APPELLANT OF KIDNAPPING, AS CONTAINED IN COUNT I OF THE INDICTMENT WITH SEXUAL MOTIVATION SPECIFICATION ONE TO COUNT ONE; GUILTY OF THE CRIME OF ABDUCTION, AS CONTAINED IN COUNT 2 OF THE INDICTMENT; AND GUILTY OF THE CRIME OF GROSS SEXUAL IMPOSITION, AS CONTAINED IN COUNTS 3 AND 4 OF THE INDICTMENT IS BASED ON INSUFFICIENT EVIDENCE.

{¶15} Murphy argues in his second and third assignments of error, in a combined discussion, that the guilty verdicts are based on insufficient evidence and are against the manifest weight of the evidence. It does not appear that Murphy challenges the trial court's finding with respect to the sexually violent predator specification, so the same will not be addressed in this appeal. In support of his argument, Murphy points to facts that he maintains the trial court failed to mention in its decision as well as evidence that contradicted some parts of M.P.'s version of events. However, Murphy has not articulated how those points lead to the conclusion that the verdicts were based on insufficient evidence or were against the manifest weight of the evidence. We note that Murphy's argument is somewhat difficult to follow and seems to focus more on credibility determinations, which would relate to weight, as opposed to the sufficiency of the evidence.

**Sufficiency of the Evidence**

{¶16} A review of the sufficiency of the evidence and the manifest weight of the evidence adduced at trial are separate and legally distinct determinations. *State v. Gulley*, 9th Dist. Summit No. 19600, 2000 WL 277908, *1 (Mar. 15, 2000). When reviewing the sufficiency of the evidence, this Court must review the evidence in a light most favorable to the prosecution to determine whether the evidence before the trial court was sufficient to sustain a conviction. *State v. Jenks*, 61 Ohio St.3d 259, 279 (1991).

An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id*. at paragraph two of the syllabus.

{¶17} Murphy was convicted of one count of kidnapping in violation of R.C. 2905.01(A)(4), with an accompanying sexual motivation specification, one count of abduction in violation of R.C. 2905.02(A)(2), and two counts of gross sexual imposition in violation of R.C. 2907.05(A)(1).

{¶18} R.C. 2905.01(A)(4), the statute prohibiting kidnapping, states that "No person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the other person * * * [t]o engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will[.]" "'Sexual activity' means sexual conduct or sexual contact, or both." R.C. 2907.01(C). "'Sexual conduct' means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." R.C. 2907.01(A). "'Sexual contact' means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶19} R.C. 2905.02(A)(2), which prohibits the crime of abduction, provides that "[n]o person, without privilege to do so, shall knowingly * * * [b]y force or threat, restrain the liberty of another person under circumstances that create a risk of physical harm to the victim or place the other person in fear[.]" R.C. 2907.05(A)(1), which prohibits gross sexual imposition, provides that "[n]o person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when * * * [t]he offender purposely compels the other person, or one of the other persons, to submit by force or threat of force." R.C. 2901.01(A)(1) defines force as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing."

{¶20} In November 2016, M.P. was an 18 year old college student at the University of Akron living on campus. Late in the evening of November 5, 2016, M.P.'s friend D.R. picked her up and brought her back to D.R.'s home, where C.C. also was. M.P., D.R., C.C. got ready and then picked up C.E. They all then went to Zar nightclub. They arrived around 11:30 p.m. or 12 a.m. M.P. denied consuming any alcohol that evening; however, she indicated that the other women did drink at the club. C.C. claimed that M.P. also had two alcoholic drinks at the club.

{¶21} While at the club, shortly after M.P. began talking to one of her friends, C.C. texted M.P. and told M.P. not to talk to C.C. for the rest of the night. At the time M.P. did not understand what the problem was. When the club closed, C.C., who drove, dropped C.E. off. M.P. repeatedly asked C.C. to take M.P. home but C.C. told M.P. that she would have to wait until the morning and drove back to D.R.'s home. When they arrived back at D.R.'s home, C.C. began to argue with M.P. M.P. maintained that C.C. was angry because the person M.P. was talking to at the club was C.C.'s ex-boyfriend. M.P. did not realize that that person was C.C.'s

ex-boyfriend. C.C., however, asserted that the argument was over M.P. owing C.C. money. M.P. admitted that she owed C.C. money but maintained that the argument was over the ex-boyfriend. C.C. then began to get in M.P.'s face. Partly because of the argument and partly because M.P. had concerns about the cleanliness of D.R.'s house, M.P. did not feel comfortable staying at D.R.'s house.

{¶22} M.P. contacted a friend who indicated he would be over in about 30 minutes to pick her up. M.P. waited outside, with a bag containing some clothing, for the person to arrive but the person did not come. While M.P. was waiting for the person to pick her up, the battery in her phone died.

{¶23} M.P. approached a house that had lights on and knocked on the door but no one answered. M.P. became afraid, started to panic, and began to cry. M.P. was not familiar with that part of Akron and had never been to D.R.'s house before. M.P. began to walk down a street to a stop sign. There she encountered a man walking who asked if she was alright. M.P. was nervous and walked into the street away from the man and told him to leave her alone. The man handed her a flashlight and a bottle of mace. M.P. told the man where she was trying to go and he told her that he could follow her there. She hesitantly allowed him to do so.

{¶24} While they were in front of a closed drive-thru, M.P. noticed a car, which she asserted drove back and forth and honked each time it drove by. Surveillance video from the drive-thru depicts the car, but it does not appear to drive by multiple times. The man she was with asked if M.P. knew the person in the car and she said she did not. The man told her maybe the person in the car could help her anyway since the person had a car and the man did not. The man then waved the car over and the car pulled into the area by the drive-thru. The man began talking to the person in the car, who was later determined to be Murphy. Murphy then pulled

into the drive-thru. M.P. proceeded to tell Murphy where she needed to go and showed him her student identification. M.P. was nervous, upset, and was crying.

{¶25} The man brought M.P. her bag and phone that she had set on the ground; however, in the process, the man dropped her phone and the screen cracked. The man asked if M.P. wanted him to go with her, but Murphy told the man no. The man then asked for his flashlight back, which M.P. gave him.

{¶26} M.P. got in the front passenger seat. She plugged her phone into an outlet in the car, but the phone would not turn on. Murphy pulled out of the drive-thru and, as soon as he got across the street, he put his hand on M.P.'s leg and began touching her. M.P. just kept telling him no over and over again. M.P. told him that she would not tell anyone if he let her go but Murphy did not say anything. After a little while, Murphy told her, "Listen, I'm doing something for you, so you're going to have to do something for me[.]" M.P. was crying and continued to tell him to stop. Murphy put his hand under her jacket and touched her breast. He also put his hands in her pants under her underwear and touched her vagina. M.P. was afraid to move but continued asking him to stop. Murphy then unbuttoned his pants and took out his penis. He told her to touch it and she did not. Murphy then grabbed her hand and put it on his penis. At one point, Murphy told her that if he did not do what he said, "he would slap the sh[*]t out of [her]" and raised his fist at her. He then stopped the car and told M.P. to kiss him and made her kiss him. He put his tongue in her mouth. At that point, M.P.'s hand was still on his penis; she thought that he would hurt her if she moved it.

{¶27} Murphy then continued driving. As they were driving, M.P. saw a car pulling out of a driveway and thought that that was someone who might help her. At that point, Murphy was driving slow enough that she thought she might be able to jump out. She manually unlocked the

door, which had locked automatically, but Murphy saw her do it and told her not to do that again. He then locked the doors and started driving a little faster. However, when Murphy was not looking, she unlocked the door again and jumped out of the moving car. She left her belongings in the car.

{¶28} M.P. hit her head on the concrete and hurt her tailbone and so could not move initially. However, once she was able to, she got up and began running down the street screaming that she needed help and had been raped. Some women heard M.P. screaming and called the police and also called M.P.'s mom.

{¶29} M.P. was taken to the hospital and examined. She also underwent a sexual assault examination. Samples from the examination were sent to the Ohio Bureau of Criminal Investigation ("BCI") for further testing.

{¶30} M.P. provided a description of the perpetrator and the vehicle to the police. She described her assailant as a black male in his 40's or 50's who was a little heavyset with some moles or marks on his face. She indicated that he was balding on the top. M.P. had a difficult time describing the type of vehicle, but noted that it was silver and the passenger window was broken and had plastic over it. Ultimately, it was determined that the vehicle was a Chevy HHR.

{¶31} Police proceeded to gather suspects and presented M.P. with a photo array. That array did not include Murphy. M.P. picked one person out but was only 40 to 50% certain that was the person responsible. That individual submitted a swab for DNA comparison; however, he was excluded as a contributor to the sample taken from M.P. Police continued to develop suspects and presented M.P. with a second array that included Murphy. M.P. identified the photo of Murphy as that of her assailant and indicated that she was 90% certain it was him. M.P. also identified Murphy in court as her attacker.

{¶32} Through the use of an app, police were able to locate M.P.'s cell phone in a trash can at a gas station a couple miles from where Murphy was living. However, it was even more broken than when M.P. last saw it.

{¶33} Police brought Murphy in for questioning and he provided a statement and a DNA sample. During the interview, when asked why he thought he was there, Murphy stated that a prostitute he was with a few nights before had told him that police were looking for him about a girl who said that Murphy raped her. Murphy then acknowledged that he did have an incident with a girl he picked up. He stated that he had picked up a girl when he was driving through the neighborhood after leaving a bar. Murphy did not think the girl was a prostitute. He saw the girl in front of a drive-thru and it looked like she was arguing with a man. The girl appeared frantic. Murphy stopped and picked her up and she said she needed to go to the University of Akron. Murphy started driving but had to take a detour. When he turned, the girl became panicked and jumped out of the car. Murphy did not stop to see if she was alright. Murphy denied touching M.P. and stated he was 100% certain that his DNA was not on her. Murphy acknowledged finding a bag of her property. He said he dumped it but did not remember where he did so.

{¶34} At the BCI, DNA was extracted from the perioral swabs and a mixture was obtained consisting of DNA consistent with that of M.P. and DNA of an unknown male. The DNA profile obtained was compared to Murphy's DNA profile, and his profile was consistent with the profile of the unknown male profile. It was estimated that the traditional DNA profile obtained from the perioral swab would occur once in 500,000 unrelated individuals. Additionally, Y-STR testing, which is male specific DNA testing, was performed. The Y-STR profile obtained from the perioral sample was likewise consistent with Murphy's DNA profile. The frequency of that profile was 1 in 621 individuals.

{¶35} Murphy also testified in his defense at trial. During his testimony, he admitted to prior convictions for rape, attempted rape, and sexual battery from the 1970's and 1980's. At trial, he told the court that he was coming from a bar and was intoxicated. Murphy testified he was in the area looking to solicit a prostitute. He claimed he thought M.P. and the man she was with were a prostitute and a pimp having an argument. Murphy pulled over and M.P. said she needed a ride to the University of Akron. M.P. willingly got into the car. Murphy described M.P. as erratic and thought maybe she was just trying to get him to give her money. He began driving but soon discovered that he would have to turn because of a detour. When he began to turn, M.P. became upset and panicked. Murphy tried to explain why he was turning. Murphy then asked if M.P. would kiss him for taking her home. Murphy testified that M.P. leaned over and he kissed her. After that, M.P. was angry and when they got to a stop sign, M.P. stated she wanted to get out. Murphy told her that was fine but he wanted to pull up a little farther because there was a car behind him. Murphy said that, as they were still driving, she then jumped out of the car. He denied trying to stop her from getting out of the vehicle. And, aside from kissing her, Murphy denied touching M.P. and denied threatening her. Murphy claimed that, at the time of the police interview, he forgot he asked her for a kiss in the car.

{¶36} Viewing the evidence in a light most favorable to the prosecution, and in light of Murphy's limited argument on appeal, in which he does not appear to contest any specific element of any of the offenses, we conclude that Murphy's convictions for kidnapping with a sexual motivation specification, abduction, and gross sexual imposition were based on sufficient evidence. From the evidence, it can be reasonably inferred that Murphy invited M.P. into the car, not to drive her back to school, but in order to engage in sexual activity with her. There was evidence that Murphy touched M.P.'s breast and vagina and grabbed her hand and made her

touch his penis. All the while, M.P. begged Murphy to stop and was upset and crying. M.P. testified that Murphy threatened her and also relocked the door locks when she first tried to escape. M.P. averred that she thought Murphy would hurt her if she did not comply.

{¶37} Murphy's third assignment of error is overruled.

**Weight of the Evidence**

{¶38} A conviction that is supported by sufficient evidence may still be found to be against the manifest weight of the evidence. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997); *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12.

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).

{¶39} To the extent Murphy has pointed out that the trial court failed to mention certain facts, we note that the trial court stated in its decision that it would "only focus on significant portions of the evidence." Murphy has not explained why the facts he has pointed to would be significant in light of the facts that the trial court did discuss. For instance, Murphy faults the trial court for failing to mention that M.P. voluntarily got into the car. However, while the trial court did not use the word voluntarily when it stated that M.P. "got into the vehicle[,]" later in the decision, the trial court noted that M.P. "accepted a ride from a stranger[.]" Murphy has not pointed to anything in the trial court's decision that would tend to indicate that the trial court believed M.P.'s initial entry into the car was forced.

{¶40} Further, to the extent Murphy raises inconsistencies between M.P.'s testimony and C.C.'s, the trial court mentioned them, but nonetheless found them to be "inconsequential to

the material issues in th[e] case." The trial court found M.P.'s testimony to be credible concerning the salient details of events. The trial court also found Murphy's testimony to be untruthful. In so doing, the trial court pointed out that, in his statement to police, Murphy indicated he was certain that his DNA would not be found on M.P. and denied kissing her. However, at trial, after there was testimony about the DNA evidence, Murphy testified that he later remembered that he asked her to kiss him and he did kiss her. "This Court has repeatedly held that the trier of fact is in the best position to determine the credibility of witnesses and evaluate their testimony accordingly." *State v. McQuistan,* 9th Dist. Medina No. 17CA0007-M, 2018-Ohio-539, ¶ 40, quoting *State v. Johnson*, 9th Dist. Summit No. 25161, 2011-Ohio-3296, ¶ 15. "Moreover, '[a] verdict is not against the manifest weight of the evidence because the finder of fact chooses to believe the State's witnesses rather than the defendant's version of the events.'" *McQuistan* at ¶ 40, quoting *State v. Martinez,* 9th Dist. Wayne No. 12CA0054, 2013-Ohio-3189, ¶ 16. Murphy has not demonstrated that this is the exceptional case where the evidence weighs heavily against his convictions. *See Otten* at 340.

{¶41} Murphy's second assignment of error is overruled.

### III.

{¶42} Murphy's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

TEODOSIO, P. J.
CALLAHAN, J.
CONCUR.

APPEARANCES:

RUSSELL A. BUZZELLI, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.