[Cite as *State v. Hansing*, 2019-Ohio-739.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

STATE OF OHIO

    Appellee

    v.

DAVID K. HANSING

    Appellant

C.A. No.    16CA011053

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE No.    15CR091254

DECISION AND JOURNAL ENTRY

Dated: March 4, 2019

CARR, Judge.

{¶1}    Defendant-Appellant David K. Hansing appeals from the judgment of the Lorain County Court of Common Pleas. This Court affirms in part, reverses in part, and remands the matter for proceedings consistent with this opinion.

I.

{¶2}    In 2014, Hansing owned two restaurants in Amherst that occupied a single building and shared a kitchen. One side of the establishment was known as Stubby's; it was a pub that specialized in craft beer. The other side of the establishment was known as Cork's and had more of an upscale dining atmosphere. J.G. worked at Stubby's as a bartender. On September 5, 2014, early in the morning after closing, Hansing asked J.G. to stay after her shift and do a liquor tasting with Hansing. The purpose of the tasting was so that J.G. could better describe the liquors to customers. At the end of her shift, and prior to the liquor tasting, J.G. had a beer and a shot of tequila.

{¶3}   During this time period, J.G. had a self-admitted high tolerance for alcohol.  Over the span of approximately an hour, Hansing served J.G. six or seven drinks of liquor and a few beers.  The quantity involved in the samples of the liquors was disputed; Hansing maintained it was a small sample of the liquors along with two shots of tequila and J.G. maintained that all of the portions were more equivalent to shots.

{¶4}   Prior to the last drink, Hansing assisted J.G. getting up on the bar so she could get a bottle from the top shelf.  While J.G. was standing on the bar, Hansing put his hand on J.G.'s leg under her dress.  After Hansing served J.G. the last drink, J.G. got back up on the bar unassisted to put the bottle back.  While J.G. was standing on the bar, Hansing again touched J.G.'s leg under her dress.  Hansing then picked J.G. up, put her on his shoulder, and proceeded to carry her around.  After Hansing put J.G. down, J.G. left the bar area and went to the bathroom.  According to J.G., Hansing followed her into the bathroom and thereafter sexually assaulted her in the hallway by the bathroom.  Hansing, however, maintained that the sexual conduct was consensual.  There was no dispute at trial that J.G. and Hansing engaged in sexual conduct.  At the time of the assault, no one else was present in the building.  Notably, the surveillance video in Stubby's and Cork's abruptly stopped recording just prior to J.G. going to the bathroom and did not begin recording again until almost 10 a.m.

{¶5}   In 2015, Hansing was indicted on one count of rape in violation of R.C. 2907.02(A)(2).  Later, a supplemental indictment was filed charging him with three counts of kidnapping in violation of R.C. 2905.01(A)(2),(A)(3), and (A)(4), and one count of sexual battery in violation of R.C. 2907.03(A)(2).

{¶6}   The matter proceeded to a jury trial.  At the close of the State's case, the State dismissed one of the counts of kidnapping and Hansing moved for an acquittal under Crim.R. 29.

Hansing's motion was denied. Hansing renewed his motion at the end of his case. Ultimately, the jury found Hansing not guilty of rape or kidnapping but guilty of sexual battery. Hansing then filed a motion for acquittal pursuant to Crim.R. 29(C), which the trial court denied at the time of sentencing.

{¶7} The trial court sentenced Hansing to 12 months in prison. Hansing has appealed, raising three assignments of error for our review, which will be addressed out of sequence to facilitate our analysis.

II.

**ASSIGNMENT OF ERROR I**

THE TRIAL COURT ERRED BY NOT ISSUING AN ACQUITTAL UNDER CRIM.R. 29 OF THE SEXUAL BATTERY CHARGE BECAUSE THE EVIDENCE WAS INSUFFICIENT TO ESTABLISH THAT THE ALLEGED VICTIM WAS SUBSTANTIALLY IMPAIRED AND EVEN IF SHE WAS, THAT APPELLANT KNEW AS SUCH.

{¶8} Hansing argues in his first assignment of error that the trial court erred in denying his Crim.R. 29 motions. Specifically, Hansing asserts that the State failed to present sufficient evidence that J.G. was substantially impaired or that Hansing knew that she was substantially impaired. As Hansing's argument is limited to the issue of substantial impairment and his knowledge or lack thereof of J.G.'s substantial impairment, we will also so limit our discussion.

{¶9} Crim.R. 29(A) provides:

The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses. The court may not reserve ruling on a motion for judgment of acquittal made at the close of the state's case.

**{¶10}** Crim.R. 29(C) states:

> If a jury returns a verdict of guilty or is discharged without having returned a verdict, a motion for judgment of acquittal may be made or renewed within fourteen days after the jury is discharged or within such further time as the court may fix during the fourteen day period. If a verdict of guilty is returned, the court may on such motion set aside the verdict and enter judgment of acquittal. If no verdict is returned, the court may enter judgment of acquittal. It shall not be a prerequisite to the making of such motion that a similar motion has been made prior to the submission of the case to the jury.

**{¶11}** When reviewing the sufficiency of the evidence, this Court must review the evidence in a light most favorable to the prosecution to determine whether the evidence before the trial court was sufficient to sustain a conviction. *State v. Jenks*, 61 Ohio St.3d 259, 279 (1991).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id.* at paragraph two of the syllabus.

**{¶12}** Hansing was convicted of violating R.C. 2907.03(A)(2). R.C. 2907.03(A)(2) provides that "[n]o person shall engage in sexual conduct with another, not the spouse of the offender, when * * * [t]he offender knows that the other person's ability to appraise the nature of or control the other person's own conduct is substantially impaired." Former R.C. 2901.22(B) indicates that "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."

{¶13} Substantial impairment is not defined for purposes of this statute, "nor has the Ohio Supreme Court ever defined the term for purposes of addressing the sufficiency of evidence." *State v. Dasen*, 9th Dist. Summit No. 28172, 2017-Ohio-5556, ¶ 19, quoting *State v. Daniels*, 9th Dist. Summit No. 25808, 2011-Ohio-6414, ¶ 6. "In a case that raised a different question, however, the [Supreme] Court noted that: The phrase substantially impaired * * * must be given the meaning generally understood in common usage. * * * [It] must be established by demonstrating a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of his conduct or to control his conduct. This is distinguishable from a general deficit in ability to cope[.]" (Internal quotations omitted.) *Dasen* at ¶19, quoting *Daniels* at ¶ 6, quoting *State v. Zeh*, 31 Ohio St.3d 99, 103-104 (1987). "Expert testimony is not required to establish substantial impairment, and the existence of a substantial impairment may be proven by the victim's testimony." *Dasen* at ¶ 19.

{¶14} With respect to R.C. 2907.01(A)(1)(c), this Court has recognized that voluntary intoxication is a mental or physical condition that could cause substantial impairment. *See State v. Boden*, 9th Dist. Summit No. 26623, 2013-Ohio-4260, ¶ 20. Nonetheless, this Court agrees that "[e]very alcohol consumption does not lead to a substantial impairment." *State v. Jenkins*, 2d Dist. Greene No. 2015-CA-6, 2015-Ohio-5167, ¶ 27, quoting *State v. Hatten*, 186 Ohio App.3d 286, 2010-Ohio-499, ¶ 23 (2d. Dist.), citing *State v. Doss,* 8th Dist. Cuyahoga No. 88443, 2008-Ohio-449, ¶ 18. In addition, we cannot say that every instance of intoxication equates with substantial impairment. "[W]hen reviewing substantial impairment due to voluntary intoxication, there can be a fine, fuzzy, and subjective line between intoxication and impairment." (Internal quotations and citations omitted.) *Jenkins* at ¶ 27. "Additionally, the waters become even murkier when reviewing whether the defendant knew, or should have

known, that someone was impaired rather than merely intoxicated." (Internal quotations and citations omitted.) *Id.*

{¶15} Here, while the facts of this case undoubtedly present an extremely close call, after reviewing the State's evidence in a light most favorable to the prosecution, we conclude that there was sufficient evidence from which a jury could conclude beyond a reasonable doubt that Hansing knew J.G.'s ability to appraise the nature of or control her conduct was substantially impaired. R.C. 2907.03(A)(2).

{¶16} There was evidence presented that, at the time, J.G. was five feet seven inches tall and weighed 120 pounds. She had worked for Hansing for at least two years and considered him a friend. She also testified that she trusted him.

{¶17} From approximately 12:40 a.m. on September 5, 2014 until approximately 1:40 a.m., J.G. testified that Hansing served J.G. seven drinks of liquor which J.G. described as being "[f]ull shots at least." Additionally, Hansing served J.G. a few beers. J.G. testified that she drank all that she was given. Further, prior to starting the tasting, at the end of her shift, J.G. also had a beer and a shot of tequila.

{¶18} While J.G. admitted that she had a high tolerance for alcohol, she nonetheless averred that she was "pretty drunk." She described the night as "blurry[,]" "[m]eaning [she] had a lot to drink." During the assault, J.G. indicated that she "froze" when Hansing took off her dress. When asked if she could stop him from lifting up her dress, she indicated that maybe if she was sober she could have but she was not sober. She averred that she was "very intoxicated."

{¶19} After the assault, J.G. went next door to the Pour House, which was a bar that the employees of Stubby's and Cork's frequented. J.G. described it as her "safe place" and that she

went there because she wanted to be around people. She went there after nearly every shift, yet, had never seen Hansing there. J.G. claimed Hansing followed her to the Pour House. While there, J.G. interacted with patrons and the owner of the bar and also had half of another beer.

{¶20} When she left there, she drove to Kate's house, who was her very good friend; Kate also worked at Stubby's and Cork's as a bartender and front house manager. She lived about a block away from Stubby's and Cork's. When J.G. arrived at Kate's house, Kate described J.G. as "a mess," "hysterical," and "very, very drunk." Kate averred that she had seen J.G. drunk before. J.G. testified that, at that time, she was "very upset, confused[, and] very drunk." J.G. then disclosed to Kate that Hansing had allegedly raped her. After they talked, Kate drove J.G. home because J.G. was "extremely intoxicated and [Kate] did not want her to drive."

{¶21} Upon returning home, J.G. woke up Kevin, her boyfriend and father of one of her children. J.G. was crying and "stumbling." J.G. told Kevin that Hansing had just raped her. After her disclosure, J.G. testified that she "passed out" in her bed still wearing the dress.

{¶22} Kevin averred that J.G. looked "drunk." On a scale of 1 to 10, with 1 being not drunk and 10 being very, very drunk, Kevin indicated that she was "probably an 8." "She wasn't stumbling, falling down, passed out, but, you know, she was drunk." Kevin stated that he could tell when J.G. was drunk based upon her eyes, slurred speech, and sometimes she would either get more combative or be more "comfortable." Additionally, he acknowledged that J.G. probably "stumble[d] around a little bit" when she was drunk. Kevin also watched surveillance video taken from the Pour House and asserted that the video also demonstrated that J.G. was stumbling a bit and not sure on her feet. He further indicated that the way she put her purse

down also supported she was intoxicated. However, he also observed that J.G. did not appear to stumble when walking out of the Pour House.

{¶23} Later that day, while J.G. was still unsure about whether she wanted to report the assault to the police, Kate convinced J.G. to have a rape kit done. The nurse who examined J.G. testified that J.G. indicated that she was taking Xanax, which the nurse indicated would enhance the effects of any alcohol consumed. While the medication should be taken daily, the nurse did not know whether J.G. was taking it as prescribed.

{¶24} That evening, a neighbor at Kate's duplex overheard discussion that J.G. had been raped. The neighbor called the police to report it. The police responded but J.G. would not give the police Hansing's name or make a report. Nonetheless, the next day, J.G. did go to the police station to report what had occurred and ultimately Hansing was indicted on the charges detailed above.

{¶25} This Court acknowledges there is additional evidence in the form of testimony from individuals at the Pour House and Hansing, as well as the surveillance video from Stubby's and Cork's and the Pour House which tends to support that J.G. was not substantially impaired; however, that evidence would go towards weight and not sufficiency. It will be thoroughly detailed below. In reviewing the sufficiency of the evidence, the Court is tasked with reviewing it in the light most favorable to the State and is not charged with evaluating credibility. *See State v. Murphy*, 9th Dist. Summit No. 28808, 2019-Ohio-290, ¶ 15-16.

{¶26} Here, there was evidence that, notwithstanding J.G.'s high alcohol tolerance, J.G. drank a large amount of alcohol in a short amount of time. Additionally, there was testimony that J.G. was prescribed Xanax, which would enhance the effects of alcohol. J.G. testified to being "pretty drunk" and "very intoxicated." Further, she asserted that her level of intoxication

contributed to her being unable to stop Hansing from removing her dress. Kate, her good friend, described J.G. as being "very, very drunk" when J.G. arrived at Kate's house. In fact, Kate felt that J.G. was so intoxicated that J.G. should not drive home. Accordingly, Kate drove J.G. home. Kevin, J.G.'s boyfriend asserted that J.G. was probably an "8" on a scale of 10 with respect to drunkenness.

{¶27} This Court concludes that there was sufficient evidence both that J.G.'s ability to appraise the nature of or control her conduct was substantially impaired and that Hansing knew or should have known the same. Hansing was not a stranger to J.G., and in fact, J.G. on multiple occasions during her testimony described him as a friend. The record also discloses that J.G. had worked for Hansing for at least two years at the time of the assault.

{¶28} While this Court reiterates that the minimal statement, standing alone, that someone was intoxicated would not be sufficient to demonstrate substantial impairment absent other indicia, here, J.G.'s close friend Kate testified that J.G. was "very, very drunk." In addition, Kate believed that J.G. was too drunk to even drive home and there was testimony that J.G.'s state contributed her to being unable to prevent Hansing from lifting up her dress. We determine that a juror could reasonably infer from the testimony detailed above that J.G. was substantially impaired. We conclude that a statement that someone was intoxicated is not equivalent to describing someone as "very, very drunk." Further, given that Hansing not only supplied J.G. with the alcohol, but also was said to be a friend of J.G., there was evidence that Hansing knew or should have known that J.G. was substantially impaired in light of the observations of J.G.'s close friend and boyfriend about her level of impairment.

{¶29} Given Hansing's argument on appeal, we conclude that he has not demonstrated that the trial court erred in denying his Crim.R. 29 motions. Hansing's first assignment of error is overruled.

## ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED BY ADOPTING THE JURY'S VERDICT FINDING APPELLANT GUILTY OF SEXUAL BATTERY THAT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶30} Hansing asserts in his third assignment of error that the verdict finding him guilty of sexual battery is against the manifest weight of the evidence. He maintains that the weight of the evidence does not support that J.G. was substantially impaired or that he knew that she was. We agree.

{¶31} "A conviction that is supported by sufficient evidence may nonetheless be against the manifest weight of the evidence. This is because the issues of sufficiency and weight are both quantitatively and qualitatively different." (Internal citation and quotations omitted.) *State v. Brown*, 9th Dist. Summit No. 26409, 2013-Ohio-2665, ¶ 10. In reviewing whether a conviction is against the weight of the evidence,

> an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the fact[-]finder's resolution of the conflicting testimony." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Tibbs v.*

*Florida*, 457 U.S. 31, 42 (1982). An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases. *Otten* at 340.

{¶32} In addition to the testimony discussed above, the State also presented surveillance video from Stubby's, Cork's, and the Pour House from the early morning in question. None of the surveillance video played for the jury had any audio. As noted above, the Stubby's and Cork's surveillance video abruptly stopped recording minutes before the sexual conduct. J.G. and Hansing both denied being involved in turning the recording device off. While Hansing did not remember turning the device back on when he returned to work that day, he acknowledged that he might have and indicated that on occasion he had to turn that device or the computer on.

{¶33} The video surveillance of Stubby's and Cork's confirms that Hansing gave J.G. several drinks in an approximately hour time frame. However, in the video, J.G. does not appear to be substantially impaired. Prior to the last drink, Hansing helps J.G. up on to the bar to get a bottle down. J.G. seems to have no difficulty maintaining her balance while on the bar. After Hansing helps her down from the bar, the two have another drink. Hansing then motions to J.G. to come over, and J.G., this time unassisted, hops up onto the bar to put the bottle back. J.G. again appears to be stable and steady while on the bar.

{¶34} Angela, who was the banquet coordinator for Cork's and Stubby's, testified on behalf of the defense. Prior to being hired as the banquet coordinator, Angela worked at Cork's and Stubby's as a server. Angela testified that she had seen J.G. intoxicated before and she would know J.G. was intoxicated by "the basic ways you know someone is intoxicated[,]" i.e. "laughing, joking, slurring, stumbling swaying * * *." Angela agreed that everyone at Cork's and Stubby's knew that J.G. could drink a lot. Angela averred that it is difficult to get up on the bar because "[i]t's a very narrow space. * * * It's a very tight space. You really kind of have to

hold yourself very steady while you're up there." Yet, in observing the surveillance video, Angela observed that J.G. had no difficulty getting up on the bar. Angela went on to state that:

> It's hard enough being sober to stand up there without having to have support or something. I mean, [J.G.] looked like she had a very easy time getting up there, and even – even getting up there sober is very difficult. So, I mean, a drunk person, to get up there on that shelf, as narrow as it is, it's very scary. I couldn't imagine trying to get up there drunk. I don't think I would attempt it.

{¶35} In her testimony, J.G. admitted that she was able to get up onto the bar with no problem. And while she did not "know if [she] necessarily look[ed] intoxicated" at that point, she maintained that she was.

{¶36} The surveillance video from the Pour House begins with J.G. and Hansing walking into the bar together, following the alleged assault. While the video does show J.G. adopting a slightly wider stance when entering the bar and J.G. crossing one leg in front of the other at times, she does not appear to stumble or sway. From what can be observed, J.G. appears happy. She smiles, interacts with the other patrons, and hugs two of them. She and Hansing both have a beer. While in the bar, J.G. stands the entire time and at one point walks over to the area where Hansing is. It appears that they engage in some conversation before Hansing goes over to, what we learn is, a lottery machine. J.G. ultimately exits the bar with another patron. J.G. appears to have no difficulty walking or maintaining her balance upon leaving the bar. From the testimony, we learn that the other person is a friend of J.G.'s, Mark, and that they went outside to smoke.

{¶37} J.G. admitted at trial that, in the video, she appeared to walk into and out of the Pour House fine. When asked if she looked impaired, J.G. responded, "no, not really. I mean, I walked in. I wasn't weaving." Nonetheless, she maintained that she was impaired. Angela also watched the Pour House video and did not believe that J.G. looked drunk in it because "she[

was] walking straight, she[ was] carrying a conversation * * * it seemed pretty typical, just pretty normal."

{¶38}  Mark, who was at the Pour House when J.G. and Hansing walked in, also testified at trial.  While Mark, at trial, described J.G. as "[a] little offset" and that she "wasn't herself as much as she normally is[,]" previously he told police that he did not notice anything out of the ordinary.  When Mark was asked at trial whether J.G. seemed intoxicated or sober, he replied that, "[t]hat night she didn't seem intoxicated."

{¶39}  John, the owner of the Pour House, also was present when Hansing and J.G. entered the bar.  John knew J.G. as a regular of the Pour House.  From his observations of J.G. and Hansing, he averred that he would not classify it as "intoxication, but they had definitely had a couple drinks; [he was] sure of it."  He clarified that there was "no visible stumbling or slurring of words, or nothing that would indicate them not being able to consume any more alcohol." John agreed that there was nothing that suggested it would be concerning to buy them each a beer that night like he did.

{¶40}  Finally, Hansing testified in his defense.  He disputed much of the victim's testimony, including the matter of consent, which is not at issue in this appeal.  Hansing maintained that, while he did serve the victim two shots of tequila, the other tastings of liquor were small sample sizes and were not full shots.  He also asserted that he served J.G. six, not seven, drinks of liquor.  Hansing gave J.G. tequila after J.G. commented that she really enjoyed the tequila that they had sampled at a prior tasting and then stated that "tequila makes [her] clothes fall off."  Hansing averred that he viewed that "as an open invite, that if you give me tequila, my clothes will fall off."

{¶41} Hansing also viewed the video from Cork's and Stubby's along with the jury. When J.G. was on the bar, Hansing observed that she did not appear to be off balance and was even standing on her "tippy-toes." He asserted that he would not have put her up on the bar if she was intoxicated. Hansing maintained that, prior to them engaging in sexual conduct, he did not notice any indication that J.G. was intoxicated or substantially impaired. Hansing also watched the Pour House video and again maintained that J.G. appeared to be walking normally. Hansing did not believe that J.G. was substantially impaired. He explained that

> as part of [his] personal insurance bond, [his] insurance company has [him] put [himself] and all [his] employees through what's called TIPS training, which is specifically focused on overserving customers, how to interpret signs of somebody being overserved and things like that, and [J.G.] exhibited no signs of someone that's been overserved or intoxicated.

{¶42} Hansing described those signs as "slurring of speech, stumbling, swaying, falling down, things like that." When questioned about how Hansing knew that J.G. could handle the liquor that he was serving her, he again referred to his TIPS training. He stated that "as the evening progresses, if someone starts slurring their speech or stumbling or falling down, then you say this person is intoxicated and you don't serve them anymore."

{¶43} J.G. did seem to have difficulty at trial recalling certain details and testified that she did not remember the specifics, such as the types of alcohol they consumed; instead, she only remembered events. Nonetheless, there is no question that J.G. did not black out before or after the alleged assault and the record is clear that she remembered quite a lot about the events of that early morning despite her assertions that she was very drunk and intoxicated. For example, J.G. described the alleged assault in some detail. She testified to Hansing coming into the bathroom and kissing her neck. She indicated that she told Hansing "no" and that he kept saying "shh." J.G. detailed the two moving out into the hallway, Hansing taking off her dress, putting his

fingers in her vagina and anus, and Hansing penetrating her vagina with his penis. J.G. specifically testified that she "remember[ed] hearing his belt buckle" prior to Hansing engaging in vaginal intercourse with her and averred that she could "still hear it."

{¶44} This Court remains mindful that "the trier of fact is in the best position to determine the credibility of witnesses and evaluate their testimony accordingly." (Internal quotations and citations omitted.) *Murphy*, 2019-Ohio-290, at ¶ 40. We also understand that exercising our power to reverse a conviction based upon the weight of the evidence is only appropriate "in exceptional cases." *Otten*, 33 Ohio App.3d at 340. However, this case is one of those exceptional cases.

{¶45} Considering the totality of the evidence, it is difficult to even conclude that the weight of the evidence supports that J.G. was visibly impaired, let alone substantially impaired. Angela, in her testimony, commented that "even getting up there [on the bar] sober is very difficult." "So, * * * a drunk person, to get up there on that shelf, as narrow as it is, it's very scary." Angela "couldn't imagine trying to get up there drunk" and "[did not] think [she] would attempt it." Yet, J.G. appeared to have no difficulty with the task.

{¶46} Nonetheless, even if this Court were to conclude that the weight of the evidence supports that J.G.'s ability to appraise the nature of or control her conduct was substantially impaired, it overwhelmingly does not support that Hansing knew or should have known the same. R.C. 2907.03(A)(2). Nothing that this Court has viewed in the video surveillance from that morning gives any indication that J.G. was experiencing "a present reduction, diminution or decrease in [her] ability, either to appraise the nature of h[er] conduct or to control h[er] conduct." (Internal quotations omitted.) *Dasen*, 2017-Ohio-5556, at ¶ 19, quoting *Daniels*, 2011-Ohio-6414, at ¶ 6, quoting *Zeh*, 31Ohio St.3d at 103-104. While there was no surveillance

footage of the alleged assault, the surveillance video does include the period minutes prior to that time as well as the period minutes after. In none of the video recorded does J.G. appear to be stumbling, swaying, or having extreme difficulties maintaining her balance. The Pour House video depicts J.G. entering and exiting the bar without problem and engaging with other people at the bar in what appears to be an unremarkable manner. Moreover, multiple witnesses that knew J.G. testified that she did not even appear intoxicated or drunk. While Hansing's behavior that morning, especially as J.G.'s employer, was certainly not appropriate or admirable, our duty is to review whether the weight of the evidence amounts to a violation of a criminal statute. Here, we cannot say that it does. Thus, we can only conclude that the jury did lose its way in finding Hansing guilty of sexual battery as specified in R.C. 2907.03(A)(2).

{¶47} Hansing's third assignment of error is sustained.

### ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED BY NOT PROVIDING JURY INSTRUCTIONS THAT SPECIFIED THAT MERE INTOXICATION DOES NOT EQUATE TO SUBSTANTIAL IMPAIRMENT.

{¶48} Hansing argues in his second assignment of error that the trial court erred in its jury instruction concerning substantial impairment. Given our resolution of Hansing's second assignment of error, this assignment of error has been rendered moot and we decline to address it.

### III.

{¶49} Hansing's first assignment of error is overruled, his third assignment of error is sustained, and his second assignment of error is moot. The judgment of the Lorain County Court of Common Pleas is affirmed in part, and reversed in part. This matter is remanded for proceedings consistent with this decision.

Judgment affirmed in part,
reversed in part,
and cause remanded.

————

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

DONNA J. CARR
FOR THE COURT

TEODOSIO, P. J.
HENSAL, J.
CONCUR.

APPEARANCES:

STEPHEN P. HANUDEL, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and LINDSEY C. POPROCKI, Assistant Prosecuting Attorney, for Appellee.