**[Cite as *State v. Carnegie*, 2021-Ohio-4597.]**

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

STATE OF OHIO

    Appellee

v.

CECIL CARNEGIE

    Appellant

C.A. No.     29844

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CR 19 04 1327

DECISION AND JOURNAL ENTRY

Dated: December 30, 2021

SUTTON, Judge.

{¶1}    Defendant-Appellant, Cecil Carnegie appeals his conviction for sexual battery from the Summit County Court of Common Pleas. For the reasons that follow, this Court affirms.

I.

**Indictment**

{¶2}    The grand jury indicted Mr. Carnegie for sexual battery, pursuant to R.C. 2907.03(A)(2), a felony of the third degree. According to the indictment, on or about May 18, 2018, Mr. Carnegie engaged in sexual conduct with A.B., not his spouse, when he "knew [A.B.'s] ability to appraise the nature of or control of her conduct was substantially impaired." Mr. Carnegie pleaded not guilty and the matter proceeded to jury trial.

**The Jury Trial**

{¶3} At trial, the State of Ohio called A.B., C. Carnegie, Officer Nathan Samples, and Detective Stephen Colburn in its case-in-chief. Mr. Carnegie did not call any witnesses in his defense. Further, the parties stipulated that A.B. is not Mr. Carnegie's spouse and Mr. Carnegie and A.B., on or about May 18, 2018, engaged in sexual conduct.

{¶4} A.B. testified she met Mr. Carnegie at a bus stop in front of King's Court Apartments on North Turkeyfoot Road. A.B. and Mr. Carnegie started a conversation and A.B. explained that "medically" she was not "feeling that great." A.B. told Mr. Carnegie she did not have a phone and she was trying "to get in contact with somebody to pick [her] up." Mr. Carnegie invited A.B. to go back to his mother's apartment and she went with him. A.B. explained she has Type 2 diabetes and iron deficiency, and on that particular day, she was "feeling heat exhaustion" due to the 100-degree temperature. A.B. testified as to being: "[d]isoriented, [with] no energy, confus[ed], delirious, dehydrated." A.B. also admitted she was using drugs "around this time," and had a criminal history of drug usage, including heroin.

{¶5} Upon arriving at Mr. Carnegie's mother's apartment, A.B. "immediately wanted to sit down." A.B. and Mr. Carnegie sat on the floor behind the only recliner in the room. A.B. then asked Mr. Carnegie to make her a bowl of cereal with a packet of Raisin Bran she had in her purse. Mr. Carnegie went to the kitchen, behind a wall outside of A.B.'s view, and prepared the cereal by putting it in a bowl and adding milk and sugar. A.B. testified, "I remember eating it. I don't remember a whole lot after that. My next clear memory is waking up with my head on his lap." A.B. also recalled going with Mr. Carnegie and his "sister" to pick up some of A.B.'s belongings that were left outside a friend's house in the yard. Prior to leaving to pick up her belongings, A.B. testified Mr. Carnegie offered her methamphetamine but the bowl was empty.

{¶6}    A.B. and Mr. Carnegie returned to his mother's apartment and A.B.'s next memory is Mr. Carnegie waking her up and telling her they "had to get outside." A.B. said "she didn't really have the energy to argue or question it. [She] wasn't able." Further, A.B. testified she "wasn't able to fully hold [herself] up, so [Mr. Carnegie] carried [her]. Not all the way. [B]ut he was holding [her] up." A.B. and Mr. Carnegie went out to the playground, which was close to Mr. Carnegie's mother's apartment, and A.B. "couldn't even stand up straight." A.B. remembered thinking, "Oh, my God, he drugged me." A.B. testified:

> [b]ut what was I going to do? It wasn't like I could run or anything. I'm still not sure if he drugged me. I'm not sure with my medical condition. I was so lethargic.
>
> * * *
>
> I'm too tired to protest. Like, I can't even hold my head up. [W]hen I got up to the second floor [of the jungle gym], I just fell. Not fell, but I laid down immediately, as soon as I stepped onto that floor.
>
> So I was literally laying on the edge of the second floor, right where you would step up. And I was not * * * staying awake. Nothing kept me awake.
>
> It was only a few seconds from the time I laid down to the time I was sleeping, long enough for him to get behind me and wrap his arms around me like we were cuddling * * * and placed himself up against me. And that was it. I was asleep again. * * * I thought I was disgusted he was placing himself against me like we were a couple. All I could do was have a disgusted thought. I fell asleep.
>
> The next thing I remember, or the next thing that happened is he wakes me up by busting me in the face with the butt of a gun across my face, right here [], like, really hard.
>
> He said: Wake, up, bitch. Take off your pants, bitch. * * * I know * * * from just psychology, all that, you do what they say. You don't want to piss them off anymore.
>
> So I reached my hands down to pull down my pants and agree with what he was saying. He did the work. I put my hands on my pants, like, I would be doing to take down my pants; but he ripped them off me at that point.
>
> * * *

He, like, violently separated my legs and, um-m, pulled down his pants and forced himself inside me. It was really fast. He * * * apologized for it being so fast, * * * like, it would offend me or something.

And I was, like, it's okay, kind of coax him, keep him pacified.

* * *

I just remember putting on my pants as fast as I could, but trying not to let my demeanor be apparent.

I remember that on the inside I was freaking out because he had a gun and I still had a knife. * * *

A.B. indicated she was able to dress herself because she "was much more alert having gone through that incident." A.B. further testified, although she did not know how she got there, "[t]here was a bedroom and a bed, and [she] woke up in it." A.B. remembered waking up but did not recall the details of leaving Mr. Carnegie's mother's apartment. A.B. testified she went to a friend's house and explained what happened with Mr. Carnegie. Approximately nine hours later, A.B. reported the incident to the police and went to the hospital to have a rape kit administered.

{¶7} Ms. Carnegie, Mr. Carnegie's niece, testified, in May of 2018, she was living with her grandmother. Mr. Carnegie was also living there during the same period of time. On May 17, 2018, Ms. Carnegie recalled an "unknown female" with Mr. Carnegie at her grandmother's apartment. Ms. Carnegie testified:

I walked in, and there was a lady [A.B.] sitting on the floor half asleep, nodding off like.

She had a bunch of bookbags, and she was coloring. But she was, like, half coloring, half asleep type deal.

Ms. Carnegie drove A.B. and Mr. Carnegie "[t]o get her belongings from the side of the road." After A.B. retrieved her belongings, they went back to the apartment. According to Ms. Carnegie, although A.B. "seemed pretty aware" in the car, she was incomprehensible and

"nodding off again" at the apartment. Ms. Carnegie described A.B. as "more than tired" and thought A.B. may have been using heroin. When asked to describe her experience with peoples' behavior while on heroin, Ms. Carnegie explained:

> They slouch a lot. They * * * nod off. [T]heir head, their eyes go uncontrollably to the back of their head. They can't keep their eyes open. They're constantly falling over.

Ms. Carnegie also explained people using heroin have slurred speech and A.B. was "slurring" her speech and "uncontrollably fell asleep[.]" She testified that A.B. fell over on the apartment floor, in slow motion, onto her bookbags. A.B. stayed asleep until Mr. Carnegie woke her up because his mother said they could not stay in her apartment. Additionally, Ms. Carnegie testified that Mr. Carnegie "grabbed [A.B.] His arm was over her shoulder. He was helping her walk, as if she had a limp or something." Before they left the apartment, Mr. Carnegie and A.B. said they were going to see if they could stay with A.B.'s aunt. Ms. Carnegie later saw Mr. Carnegie and A.B. at the playground, but she could not see what they were doing.

{¶8} Officer Nathan Samples, with the City of Barberton Police Department, was working patrol on May 18, 2018. At 5:33 p.m., Officer Samples received a call from dispatch regarding a female at St. Francis de Sales wanting to report a sexual assault that occurred in the City of Barberton. Officer Samples took A.B. to his cruiser and asked if she felt comfortable speaking with a male officer. A.B. indicated she was comfortable speaking with Officer Samples and wanted to go to the hospital. Prior to getting in the police cruiser, A.B. handed Officer Samples the undergarment she wore during the sexual assault and he placed them in an evidence bag. As they started to drive to Akron General Medical Center, A.B. "immediately fell asleep." Upon arriving at the hospital, Officer Samples woke A.B. and she recalled the incident with Mr. Carnegie as follows:

[A.B.] was standing at a bus station * * * where she met [Mr. Carnegie]. She said she struck up a conversation with him. [Mr. Carnegie] invited her back to his apartment, [and] she went with him.

[A.B.] said, while at the apartment, she was offered a bowl of cereal. She accepted the bowl of cereal, began eating the bowl of cereal, and immediately began feeling very drowsy.

[A.B.] said, after * * * finishing the bowl of cereal, she fell asleep.

[A.B.] said after some time, about 2 in the morning, she was awoken, carried outside of the apartment to what she called a playground, where [Mr. Carnegie] laid down a blanket and attempted to pull down her pants.

[A.B.] stated she pulled up her pants, said, "No." And she fell back asleep.

[A.B.] stated after some time, she was awoken again with the butt of a pistol striking her. [A.B.] stated at this point that [Mr. Carnegie] said to the effects of: Bitch, pull down [your] pants. * * * It was at that point that [Mr. Carnegie] penetrated her with his penis, until he ejaculated inside of her vagina. * * *

Officer Samples also testified that A.B. admitted to using methamphetamine the afternoon prior to the sexual assault.

{¶9} Detective Stephen Coburn, with the City of Barberton Police Department, investigated the report made by A.B. about the sexual assault. During the investigation, Detective Coburn went to Mr. Carnegie's mother's apartment and interviewed Mr. Carnegie, his mother, and Ms. Carnegie. Detective Coburn testified:

* * *

[Mr. Carnegie] immediately told me * * * about the girl he met * * * at the bus stop and how that he brought her back down to his mom's apartment.

[E]verybody was standing in front of me, his niece, his mom, him, and his girlfriend.

And they were all telling me how [A.B.] appeared to be high or impaired and began to tell me how she was acting.

* * *

> There was mention of [Mr. Carnegie] had meth back at his apartment * * * and then also the fact that * * * [A.B.] was upset and impaired[.]
>
> * * *

After stepping outside to speak privately with Detective Coburn, Mr. Carnegie admitted to having sexual intercourse with A.B.

{¶10} At a later date, Mr. Carnegie voluntarily went to the Barberton police station to give a statement to Detective Coburn. The interview was videotaped and played for the jury. During the interview, Mr. Carnegie explained his knowledge about heroin use and that he believed A.B. had used heroin, or was under the influence of something, on the date of the incident. Specifically, Mr. Carnegie described A.B. as being "fucked up on heroin." Mr. Carnegie also admitted he prepared cereal for A.B., A.B. used the bathroom at his mother's apartment, and A.B. "went downhill" after eating the cereal. Further, Mr. Carnegie provided Detective Coburn with a hypothetical situation wherein he indicated a person should not make a "move" on a drunk girl in a bar and agreed the situation with A.B. could be construed as sexual assault. Mr. Carnegie admitted to having sexual intercourse with A.B. and told Detective Coburn his "gut" was telling him issues may arise if they kept having sex including diseases, whether A.B. had a boyfriend, Mr. Carnegie's girlfriend, and that A.B. was under the influence of something. Ultimately, Detective Coburn concluded Mr. Carnegie's statements, about A.B.'s condition, were "very consistent" with the statements of Ms. Carnegie and Mr. Carnegie's mother that A.B. "was nodding in and out[;]"A.B. "gave all signs of being impaired[;]" and A.B. "was impaired on something, whether it be heroin, meth."

**The Verdict**

**{¶11}** After hearing the testimony and reviewing the evidence, the jury returned a guilty verdict and Mr. Carnegie was sentenced to five years imprisonment. Further, Mr. Carnegie is a Tier III sex offender with lifetime reporting requirements.

**{¶12}** Mr. Carnegie now appeals, raising two assignments of error for our review.

**II.**

**ASSIGNMENT OF ERROR I**

**[MR. CARNEGIE'S] CONVICTION WAS BASED UPON INSUFFICIENT EVIDENCE TO SUSTAIN CONVICTION. THE TRIAL COURT ERRED BY DENYING [MR. CARNEGIE'S] CRIM.R. 29 MOTION.**

**{¶13}** In his first assignment of error, Mr. Carnegie argues the State failed to demonstrate by sufficient evidence "that Mr. Carnegie knew A.B. was substantially impaired." We disagree.

**{¶14}** This Court reviews the denial of a defendant's Crim.R. 29 motion for acquittal by assessing the sufficiency of the State's evidence. *State v. Frashuer*, 9th Dist. Summit No. 24769, 2010-Ohio-634, ¶ 33. Whether a conviction is supported by sufficient evidence is a question of law, which this Court reviews de novo. *State v. Salupo*, 9th Dist. Lorain No. 07CA009233, 2008-Ohio-3721, ¶ 4, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "A challenge to the sufficiency of the evidence concerns the State's burden of production * * *" and is, "[i]n essence, * * * a test of adequacy." *In re R.H.*, 9th Dist. Summit No. 28319, 2017-Ohio-7852, ¶ 25; *Thompkins* at 386. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. However, "we do not resolve evidentiary conflicts or

assess the credibility of witnesses, because these functions belong to the trier of fact." *State v. Hall*, 9th Dist. Summit No. 27827, 2017-Ohio-73, ¶ 10.

{¶15} R.C. 2907.03(A)(2) prohibits a person from "engag[ing] in sexual conduct with another, not the spouse of the offender, when * * * [t]he offender knows that the other person's ability to appraise the nature of or control the other person's own conduct is substantially impaired." The phrase "substantially impaired" is not defined for purposes of R.C. 2907.03(A)(2), however the Supreme Court of Ohio, upon review of a different issue, stated that substantial impairment "must be given the meaning generally understood in common usage. * * * [It] must be established by demonstrating a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of his conduct or to control his conduct. This is distinguishable from a general deficit in ability to cope[.]" (Alterations sic.) *State v. Daniels*, 9th Dist. Summit No. 25808, 2011-Ohio-6414, ¶ 6, quoting *State v. Zeh*, 31 Ohio St.3d 99, 103-104 (1987). Expert testimony is not required to establish substantial impairment, and the existence of a substantial impairment may be proven by the victim's testimony. *Daniels* at ¶ 6. Further, voluntary intoxication is recognized as "a mental or physical condition that could cause substantial impairment." *State v. Hansing*, 9th Dist. Lorain No. 16CA011053, 2019-Ohio-739, ¶ 14.

{¶16} Here, the State presented evidence from A.B. that, on May 17, 2018, she felt disoriented, confused, and lacked energy, possibly due to her medical conditions and extreme heat. A.B. testified that while at Mr. Carnegie's mother's apartment, she was falling in and out of consciousness. After eating cereal prepared by Mr. Carnegie, A.B. thought she may have been drugged. A.B. recalled Mr. Carnegie waking her because his mother wanted them to leave. However, A.B. could not walk on her own and needed Mr. Carnegie's assistance to go outside.

A.B. testified that, while at the playground with Mr. Carnegie, she was too tired to protest and could not hold her head up; nothing kept her awake. Sometime in the early morning hours of May 18, 2018, A.B. testified Mr. Carnegie woke her by striking her cheek with the butt of a pistol and demanding she pull down her pants. A.B. attempted to appease Mr. Carnegie but could not pull down her own pants. Mr. Carnegie ripped off A.B.'s pants and violently spread open her legs. At this time, Mr. Carnegie penetrated A.B. with his penis and ejaculated inside her vagina. Additionally, A.B. testified that, after the sexual assault, she woke up in a bed in Mr. Carnegie's mother's apartment, but she does not recall the details of how she got there or left the apartment.

{¶17} Ms. Carnegie, who was also present at the apartment during the relevant time period, testified A.B. was nodding off, incomprehensible, and impaired possibly by heroin. Ms. Carnegie testified that she had personal experience with people on heroin and recognized those same symptoms in A.B., including slurred speech. Ms. Carnegie also admitted that A.B. needed assistance when leaving her grandmother's apartment because she could not walk on her own. Ms. Carnegie saw Mr. Carnegie and A.B. at the playground but could not actually see what they were doing because it was dark outside.

{¶18} Officer Samples testified A.B. almost immediately fell asleep in the police cruiser, although several hours had passed since the sexual assault, while enroute to the hospital. Further, although A.B. later denied doing so, Officer Samples testified A.B. admitted to taking methamphetamines prior to the sexual assault.

{¶19} Detective Coburn testified about details of his investigation, including his initial conversation with Mr. Carnegie, Mr. Carnegie's mother, and Ms. Carnegie and Mr. Carnegie's voluntary interview at the police station. Importantly, during Detective Coburn's testimony, the

jury viewed portions of Mr. Carnegie's recorded interview which revealed Mr. Carnegie's knowledge of A.B.'s impairment. Further, the video substantiated Mr. Carnegie's "gut" feeling that he should not engage in sexual conduct with A.B. because she was under the influence of something.

{¶20} Based upon the foregoing, and in viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the State demonstrated by sufficient evidence that Mr. Carnegie knew A.B. was substantially impaired at the time of the sexual assault.

{¶21} Accordingly, Mr. Carnegie's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

**THE JURY VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

{¶22} In his second assignment of error, Mr. Carnegie argues the jury verdict is against the manifest weight of the evidence. We disagree.

{¶23} As this Court has previously stated:

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "[W]hen reversing a conviction on the basis that it was against the manifest weight of the evidence, an appellate court sits as a 'thirteenth juror,' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Tucker*, 9th Dist. Medina No. 06CA0035-M, 2006-Ohio-6914, ¶ 5. This discretionary power "'should be exercised only in the exceptional case in which the evidence weighs heavily

against the conviction.'" *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). *See also Otten* at 340.

{¶24} Here, Mr. Carnegie argues the evidence does not support he committed the crime of sexual battery because A.B. was coherent during various periods of time, including during the sexual encounter. Further, Mr. Carnegie argues A.B. testified "she was not under the influence of drugs at the time of the offense." As indicated above, however, the jury heard all of the testimony, including the cross-examination of the State's witnesses, and reviewed the evidence. The jury heard A.B. testify that, after being struck by the butt of a pistol in the face and being sexually assaulted, she was more alert than prior to the attack. However, the jury also heard A.B. testify that, when she and Mr. Carnegie first arrived at the playground, she could not stay awake and did not have the ability to protest. Further, after the sexual assault, the jury heard A.B. testify she did not recall the details of going back to Mr. Carnegie's mother's apartment or ultimately leaving the apartment.

{¶25} The jury also heard Officer Samples testify that, several hours later, A.B. immediately fell asleep in the police cruiser and then admitted to using methamphetamine prior to the sexual assault. Ms. Carnegie testified about A.B.'s demeanor and the fact she was falling in and out of consciousness. Ms. Carnegie also testified that A.B. needed Mr. Carnegie's assistance when leaving the apartment to go to the playground because she could not walk on her own at that time. Lastly, the jury heard Detective Coburn's testimony and saw portions of Mr. Carnegie's recorded interview where he described A.B. as being "fucked up on heroin" and admitted having a "gut" feeling that he should not engage in sexual conduct due to A.B.'s impairment.

{¶26} As the trier of fact, the jury is tasked with the very difficult responsibility of resolving conflicting testimony and evidence presented at trial. However, the jury's resolution of these types of discrepancies in favor of the State does not, in and of itself, invalidate a guilty verdict. Based upon the record before us, this Court cannot say the jury clearly lost its way and created such a manifest miscarriage of justice that the sexual battery conviction against Mr. Carnegie must be reversed and a new trial ordered.

{¶27} Accordingly, Mr. Carnegie's second assignment of error is overruled.

III.

{¶28} For the reasons stated above, Mr. Carnegie's assignments of error are overruled and the judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

BETTY SUTTON
FOR THE COURT

HENSAL, P. J.
TEODOSIO, J.
CONCUR.

APPEARANCES:

ALAN M. MEDVICK, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.