[Cite as *State v. Harris*, 2020-Ohio-4365.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

STATE OF OHIO

    Appellee

v.

COREN HARRIS

    Appellant

C.A. No.    29583

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CR 19 01 0017

DECISION AND JOURNAL ENTRY

Dated: September 9, 2020

CARR, Presiding Judge.

{¶1} Defendant-Appellant Coren Harris appeals from the judgment of the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2} In January 2019, Harris was indicted on one count of rape, one count of kidnapping, and one count of sexual battery related to an assault on his cousin, D.H., on August 1, 2018. Later, a supplemental indictment was filed adding repeat violent offender specifications to the first two counts.

{¶3} The matter proceeded to a jury trial. The jury found Harris not guilty of rape and kidnapping. However, the jury found Harris guilty of sexual battery. Harris was sentenced to four years in prison. Harris has appealed, raising two assignments of error for our review.

II.

**ASSIGNMENT OF ERROR I**

THE TRIAL COURT ERRED BY ADOPTING THE JURY'S VERDICT FINDING APPELLANT GUILTY OF SEXUAL BATTERY WHERE THE CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶4} Harris argues in his first assignment of error that the jury's verdict finding him guilty of sexual battery was against the manifest weight of the evidence. Specifically, he asserts that the weight of the evidence does not support that the victim, D.H., was substantially impaired or that Harris knew that she was substantially impaired. Our discussion will be limited accordingly.

{¶5} In determining whether a criminal conviction is against the manifest weight of the evidence,

> an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the fact[-]finder's resolution of the conflicting testimony." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases. *Otten* at 340.

{¶6} Harris was found guilty of violating R.C. 2907.03(A)(2)/(B). R.C. 2907.03(A)(2) states that "[n]o person shall engage in sexual conduct with another, not the spouse of the offender, when * * * [t]he offender knows that the other person's ability to appraise the nature of or control

the other person's own conduct is substantially impaired." "Whoever violates [R.C. 2907.03] is guilty of sexual battery." R.C. 2907.03(B). "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact." R.C. 2901.22(B).

{¶7} In evaluating R.C. 2907.03(A)(2), this Court has determined that "[t]he phrase substantially impaired * * * must be given the meaning generally understood in common usage. * * * [It] must be established by demonstrating a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of his [or her] conduct or to control his [or her] conduct. This is distinguishable from a general deficit in ability to cope[.]" (Internal quotations and citations omitted.) *State v. Hansing*, 9th Dist. Lorain No. 16CA011053, 2019-Ohio-739, ¶ 13. "Expert testimony is not required to establish substantial impairment, and the existence of a substantial impairment may be proven by the victim's testimony." *Id.*, quoting *State v. Dasen,* 9th Dist. Summit No. 28172, 2017-Ohio-5556, ¶ 19. "[V]oluntary intoxication is a mental or physical condition that could cause substantial impairment." *Hansing* at ¶ 14. Nonetheless, "[e]very alcohol consumption does not lead to a substantial impairment." (Internal quotations and citations omitted.) *Id.* Moreover, not every instance of intoxication equates with substantial impairment. *Id.* "[W]hen reviewing substantial impairment due to voluntary intoxication, there can be a fine, fuzzy, and subjective line between intoxication and impairment." (Internal quotations and citations omitted.) *Id.* "[T]he waters become even murkier when reviewing whether the defendant knew,

or should have known, that someone was impaired rather than merely intoxicated." (Internal quotations and citations omitted.) *Id.*

{¶8} At the time of the assault, D.H. was in her forties. D.H. and Harris are cousins and have known each other since elementary school. Prior to the assault, D.H. testified that she was very close to Harris.

{¶9} On August 1, 2018, D.H. was supposed to pick up her close friend, Devin, whom she had also known since elementary school. The two were going to go to a clothing store. D.H. was late and Devin ended up taking a bus to go home. On his way home, D.H. called Devin and asked him to get off the bus and meet her. According to Devin, D.H. wanted Devin to drive because she was "a little bit lit." Devin agreed to do so and then drove them to the clothing store. On the way back, D.H. wanted to stop at Harris' house to get some marijuana.

{¶10} In his testimony, Devin first described D.H.'s alcohol consumption in terms of shots, but subsequently testified that D.H. was drinking from a bottle of vodka and that she had a half a pint of vodka prior to getting to Harris' and a whole pint while at Harris'. Devin indicated that D.H. was pretty drunk. Devin also testified that D.H. smoked marijuana while at Harris'. D.H. testified that there was a bottle of alcohol with her in the car. Prior to meeting Devin, she estimated that she had one to two shots and was able to drive. Once Devin was driving, D.H. had more alcohol. She estimated that she had five or six more shots before arriving at Harris'. Once at Harris' D.H. asserted that she began drinking from the bottle. She estimated that she had "a couple swigs" from the bottle and smoked marijuana while she was at Harris'. D.H. described herself as being "intoxicated quite a bit" such that she did not "remember everything initially." However, she also testified that she was not "intoxicated where [she] was falling over * * * where

[she] was like passed out." She testified that she was "drunk" but not "she need[s] an ambulance type of drunk." D.H. testified that the marijuana did not have much effect on her.

{¶11} When they arrived at Harris' house, D.H. went on the porch to play with some puppies and Devin and Harris were inside playing on the Xbox. Harris and Devin heard a yelp, and Harris became angry, went on the porch, grabbed D.H. from under her arms, and dragged her inside. The two began arguing and Devin stepped outside. Devin testified that, when he came back in, things had settled down. D.H. started dancing, but in the process of doing so, tripped over something and knocked a few things to the ground. Devin helped D.H. to the couch. Harris became angry, went to the kitchen, returned, and then zip tied D.H.'s legs. D.H. testified that she was on the ground when Harris put the zip ties on her, and she then sat down on the couch. D.H. and Harris started to argue again. Harris told D.H. to "shut up and just sit there [and was] just trying to make [D.H.] sit down." At the time, D.H. was not overly concerned about the zip ties and thought it was just "horseplay." Devin then left to go the store.

{¶12} D.H. testified that, after Devin left, Harris put her on the edge of the couch, pushed her legs up, pulled her leggings down, and had vaginal intercourse with her. When Devin returned, he found Harris having sex with D.H. Devin heard D.H. saying, "Stop. Stop. Get off of me. This is not right. This is not right." Devin went outside in shock and called D.H.'s son. Devin went to go back in and D.H. then came running out of the house and told Devin that "both of [them were] wrong[.]" D.H. was frantic and "shaking and crying[.]" D.H. refused to give Devin a ride and left in her car. She asserted that she was "very wide alert" after the trauma; it "sobered" her up. Harris ultimately gave Devin a ride. While they were in the car together, Harris told Devin that D.H. deserved it and asked why Devin did not join in.

{¶13} D.H. went to her grandmother's house. She initially did not call the police because Harris was family and she knew doing so would cause problems. A couple days later, D.H. went to Planned Parenthood but she was told she needed to go to the hospital. D.H. then proceeded to the emergency room. Devin met her there. D.H. was examined by Patti Riley, R.N., and a rape kit was performed. Ms. Riley documented several bruises that appeared to all be around the same age; some of the bruises appeared to look like fingertip impressions. D.H. was also questioned by police. Detective Dawn Forney, a detective with the Akron Police Department, interviewed D.H. at the hospital. D.H. told Detective Forney that she had been drinking the day of the assault and that she had "four little shots[.]" Upon returning home, D.H. located the leggings, shorts, and a feminine hygiene pad she was wearing at the time of the assault. They had not been laundered. The items were submitted to the police for possible testing. Stacy Violi, a forensic scientist with the Ohio Bureau of Criminal Investigation, testified that the vaginal and anal samples from D.H. contained no DNA profile foreign to D.H. Ms. Violi indicated that the DNA profile recovered from D.H.'s leggings contained a mixture of DNA consistent with that of D.H. and Harris. The portion consistent with Harris' DNA profile was expected to be seen in the population less than one in one trillion times. The DNA profile obtained from the shorts was also a mixture with the major profile consistent with D.H. The minor profile was from a male but was not of sufficient quality or quantity to compare it to any individual.

{¶14} On cross-examination, D.H. acknowledged that she and Harris had had a consensual sexual encounter over a decade prior to the assault. She stated that it happened when they were both high, that they knew it was wrong, and it never happened again.

{¶15} After an independent review of the record, we conclude that the jury's verdict is not against the manifest weight of the evidence. While the testimony as to how much alcohol D.H.

had varied, the record is clear that D.H. had a substantial amount of alcohol and also smoked marijuana. Some of that alcohol and all of the marijuana was consumed during D.H.'s visit to Harris' house. D.H. described herself as being "intoxicated quite a bit" such that she did not "remember everything initially." Devin, who was completely sober, testified that, when he met D.H., D.H. wanted him to drive because she was already "a little bit lit." By the time they were at Harris' Devin indicated that D.H. was pretty drunk. While D.H. also testified that she was not falling over or in need of an ambulance, D.H. did trip and fall while dancing and knocked some items off of an end table. Devin then helped D.H. to the couch. In order to control D.H. and get her to "shut up and just sit there[,]" Harris put zip ties around D.H.'s ankles. From those circumstances, it would not be unreasonable for the trier of fact to infer that D.H. was not only intoxicated, her "ability to appraise the nature of or control [her] own conduct [wa]s substantially impaired." R.C. 2907.03(A)(2). While D.H. did remember many details, she also admitted some difficulty remembering everything. In addition, the jury could have attributed her coordination issues to alcohol and/or marijuana impairment. Moreover, Harris and D.H. grew up together and there was evidence presented that the two had gotten high together in the past. Thus, there was evidence that Harris would be aware of what D.H. was like when she was impaired. In addition, there was evidence that Harris was so annoyed by D.H.'s drunken behavior that he zip tied her legs; this would also support the notion that Harris was aware of D.H.'s substantial impairment. Therefore, the jury could have also reasonably concluded that Harris knew that D.H.'s ability to appraise the nature of or control her own conduct was substantially impaired when he assaulted her.

{¶16} While Harris argues the facts of this case are similar to those in *Hansing*, a case in which this Court found a defendant's conviction for sexual battery was against the weight of the

evidence, we determine the facts of this case are distinguishable. *See Hansing*, 2019-Ohio-739, ¶ 46. Notably, in *Hansing* there was surveillance video of the victim. *Id.* at ¶ 32. Despite the victim's testimony that she was very intoxicated, *id.* at ¶ 26, "[i]n none of the video recorded [did the victim] appear to be stumbling, swaying, or having extreme difficulties maintaining her balance." *Id.* at ¶ 46. Moreover, multiple witnesses who knew the victim and saw her immediately after the alleged assault testified that she did not appear intoxicated or drunk. *Id.* Here, there was no surveillance video or other witness testimony which contradicted D.H.'s impairment.

{¶17} Harris has not demonstrated that the jury's verdict was against the manifest weight of the evidence. Harris' first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED BY NOT PROVIDING JURY INSTRUCTIONS THAT SPECIFIED THAT MERE INTOXICATION DOES NOT EQUATE TO SUBSTANTIAL IMPAIRMENT.

{¶18} Harris argues that the trial court committed plain error in failing to instruct the jury that mere intoxication does not equate to substantial impairment.

{¶19} Harris admits that he did not object to the jury instructions; thus, he has forfeited all but plain error. *State v. Higgins*, 9th Dist. Summit No. 27700, 2018-Ohio-476, ¶ 27. "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B).

> By its very terms, [Crim.R. 52(B)] places three limitations on a reviewing court's decision to correct an error that was not raised below. First, an error, i.e., a deviation from a legal rule, must have occurred. Second, the error complained of must be plain – that is, it must be an obvious defect in the * * * proceedings. Third, the error must have affected substantial rights. We have interpreted this * * * to mean that the trial court's error must have affected the outcome of the proceedings.

(Internal quotations and citations omitted.) *State v. Martin*, 154 Ohio St.3d 513, 2018-Ohio-3226, ¶ 28. Thus, "[t]his Court may not reverse the judgment of the trial court on the basis of plain error,

unless appellant has established that the outcome of trial clearly would have been different but for the alleged error." *Higgins* at ¶ 27, quoting *State v. Klingel*, 9th Dist. Lorain No. 15CA010876, 2017-Ohio-1183, ¶ 29; *see also Martin* at ¶ 32 (noting the burden to establish plain error is on the appellant).

{¶20} The jury was instructed that: "Before you can find the defendant guilty, you must find beyond a reasonable doubt that on or about the 1st of August, 2018, in Summit County Ohio, the defendant engaged in sexual conduct with [D.H.], who was not his spouse, and the defendant knew that [D.H.'s] ability to appraise the nature of or control her own conduct was substantially impaired." In defining knowingly and knowledge, the trial court stated: "Because you cannot look into the mind of another, knowledge is determined from all the facts and circumstances in evidence. You will determine from these facts and circumstances whether there existed at the time in the mind of the defendant an awareness of the probability that [D.H.'s] ability to appraise the nature of or control her conduct was substantially impaired." Despite Harris' argument to the contrary, substantially impaired was defined; however, the definition appeared in the section related to the charge for kidnapping, not sexual battery. Substantially impaired was defined by the trial court as a "present reduction, diminution or decrease in [D.H.'s] ability to either appraise the nature of her conduct or control her conduct." Nonetheless, Harris is correct that the trial court did not instruct the jury that every instance of intoxication does not equate to substantial impairment. *See Hansing*, 2019-Ohio-739, at ¶ 14 (discussing the concept in terms of a sufficiency analysis).

{¶21} Notwithstanding the foregoing, even if we were to assume that the trial court should have provided the instruction as argued by Harris, Harris has not explained how the result of the trial would have been different if that instruction was given. *See Higgins,* 2018-Ohio-476, at ¶ 27.

While Harris has stated that "[b]ut for that error the outcome at trial would have been different[,]" he has developed no argument explaining why that would be so. *See* App.R. 16(A)(7). As discussed above, the weight of the evidence supported the conclusion that D.H.'s ability to appraise the nature of or control her own conduct was substantially impaired and that Harris knew the same.

{¶22} Harris has not met his burden of demonstrating that the trial court committed plain error in instructing the jury. Harris' second assignment of error is overruled.

III.

{¶23} Harris' assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
DONNA J. CARR
FOR THE COURT

SCHAFER, J.
HENSAL, J.
CONCUR.


APPEARANCES:

AVIVA L. WILCHER, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.