[Cite as *State v. Peacock*, 2022-Ohio-4021.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No.  L-21-1235

      Appellee                              Trial Court No.  CR0202002050

v.

Franklin Peacock                          **DECISION AND JUDGMENT**

      Appellant                             Decided:  November 10, 2022

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett and Lorrie J. Rendle, Assistant Prosecuting
Attorneys, for appellee.

Adam H. Houser, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, Franklin Peacock, appeals the October 27, 2021 judgment of the

Lucas County Court of Common Pleas, which found him guilty of sexual battery, and

sentenced him to 54 months in prison and lifetime registry as a sex offender.  For the

following reasons, we affirm the trial court's judgment.

# I. Background and Facts

{¶ 2} On September 1, 2020, Peacock was indicted on two counts, one count of rape in violation of R.C. 2907.02(A), a first-degree felony, and one count of sexual battery in violation of R.C. 2907.03(A)(2), a third-degree felony.

{¶ 3} The case was tried to a jury in September 2021.  At trial, the state presented the testimony of the victim, V.F.; her daughter, Katie Fuller; Toledo Police Department ("TPD") officer Tim Sturtz;  TPD special victims unit ("SVU") detective Israel Garrett and sergeant Diane Kozlaker; sexual assault nurse examiner ("SANE"), Cara Coberly; and Ohio Bureau of Criminal Investigation ("BCI") forensic scientist, Christine Hammett.  The following facts were established at trial.

{¶ 4} The charges arose from an incident in August 2019, involving Peacock's neighbor, V.F.  At trial, V.F. testified that at the time of the incident, she was in a compromised state from alcohol and drug use after a late night celebrating her daughter's 21st birthday that continued well into the next morning.

{¶ 5} In the early morning of August 22, V.F., Fuller, and their neighbor, Connie, decided to celebrate Fuller's 21st birthday by going "bar hopping."  The trio arrived at the first bar around 12:45 a.m., and they started drinking "very fast" at the bar.  V.F. recalls drinking five rounds of drinks and shots within the one and one-half hours before "last call."  When the bar closed at 2:30 a.m., the group got a ride home, returning to V.F.'s house around 3:00 a.m.

**{¶ 6}** When V.F. arrived home, she discovered that—although her adult son, Chase, who has special needs, and two-year-old grandson were home sleeping all night—their house had been burglarized while they were out. Several valuable items were taken from their living room, including a television, a Kindle, a PlayStation 3, and a laptop. They also believed that their rent money had been stolen, but Fuller later found most of the missing cash in her laundry. V.F. testified that she decided not to call the police immediately because she was "so drunk" that she did not think that she could make a police report.

**{¶ 7}** The women's distress over the burglary contributed to their decision to continue drinking; they "hung out" on V.F.'s front porch, drank more liquor, and, over time, they were joined by a couple neighbors. Additionally, V.F. admitted that sometime that morning she did two lines of poor-quality cocaine, and got into a physical altercation with someone named Jacqueline.

**{¶ 8}** V.F. estimated that the drinking and birthday celebration continued past 7:00 a.m. because she saw "kids [] walking to the school bus." Around that time, she recalled that Peacock walked by her house smoking a "blunt." V.F. called out to him to share it with them for her daughter's birthday; he obliged, and everyone on the porch smoked. During this time, Fuller grew increasingly upset about the burglary, and was sobbing. When Peacock asked what was wrong, V.F. and Fuller told him that their home was burglarized while they were at the bar. V.F. did so hoping that Peacock "would deal with it."

{¶ 9} Soon after, Chase and V.F.'s grandson awoke and came out to the porch, leaving the house empty.[1] At that point, V.F. claimed that Peacock asked her to show him what had been taken from her home. V.F.'s grandson was crying for his "blankie," so V.F. took him inside with her and Peacock. Her grandson ran ahead into the bedroom to look for his blanket. As V.F. followed him into her bedroom, Peacock suddenly came up behind her, pushed her onto the bed, and held her hands down. V.F. recalled crying and asking Peacock not to do anything because her grandson was in the room. But Peacock held her down on her stomach, pulled her pants down, and forced his penis inside her vagina. V.F. said that she did not want to fight too much because she was concerned her grandson might get hurt. During the assault, V.F. recalled that her grandson was crying for her and smacking Peacock on the leg, trying to make him stop.

{¶ 10} Despite her repeated pleas for him to stop, Peacock asserted that "he was almost done or it was almost over," and he continued until he ejaculated. After Peacock finished, he got off of V.F. right away, and promptly left the house through the front door. V.F. remained in the bedroom and tried to console her grandson, but she was distressed and in shock.

---

[1] There was a discrepancy between V.F.'s testimony and Fuller's testimony about whether Chase was awake and on the porch at the time of the assault. V.F. testified that Chase came out onto the porch at the same time as her grandson, and that the inside of the house was empty. Fuller testified that Chase was still sleeping inside the home, and that only her toddler came out onto the porch.

{¶ 11} When Peacock came back out to the porch, Fuller thought he "seemed pretty normal," but also "like he was rushing to leave," because he would usually hang out and talk, but he did not that morning. Fuller testified that, on his way out, Peacock told her, "you don't owe me that ten anymore. Don't worry about it, something like that," in reference to money she previously owed him for marijuana.

{¶ 12} Sometime after the assault, V.F.'s 15-year-old neighbor stopped by after missing the bus to school and found V.F. crying in the bedroom with her grandson. When the neighbor came in to check on her, V.F. handed her grandson to him.

{¶ 13} After Peacock left, V.F. resumed drinking heavily, and became increasingly hysterical. According to Fuller, at some point, V.F. came out to the front porch and they had a brief conversation. Fuller recalled that V.F. "looked a mess" and that "she was inconsolable." Fuller saw V.F. walk down the street "in [a] daze," and sit down in a puddle while "hysterical[ly]" crying. The next thing V.F. remembers is sitting on the grass, crying and talking with the police.

{¶ 14} Around 9:00 a.m., two TPD officers were dispatched to V.F.'s block to perform a wellness check. When they arrived at V.F.'s home, they found V.F. sitting on the grass crying. The state submitted footage from officer Sturtz's body camera as an exhibit at trial. The video shows V.F. sitting on the walkway to her home, visibly distressed and sporadically sobbing. V.F. tells the officers that she is drunk, her voice is trembling, she is rocking back and forth, she keeps repeating herself, and her recall is scattered. She explains to them that "Frank Peacock" raped her while her grandson was

watching and crying for her, and that she "begged him to stop," but when she did, he "shoved her face" further into the bed. V.F. also reported the burglary, listed the stolen items, and claimed that Peacock was "going to help" her with the burglary. When the officers asked V.F. what Peacock was wearing, she said, "I wish I could tell you, but I had a blackout moment in there." She also said several times that she "went to high school" with Peacock, but this was not true.

{¶ 15} When the officers discovered that V.F. had been sexually assaulted, they called in detectives from the SVU. When detectives Kozlaker and Garrett arrived, they confirmed that V.F. had not changed her clothes or bathed, Peacock had not used protection, and the bedsheets had not been changed.

{¶ 16} The officers took V.F. to St. Charles Hospital, where Coberly, the SANE, conducted a sexual assault exam and collected a rape kit. During her testimony, Coberly explained that, when a victim comes into the ER, she takes their vitals, performs a physical and pelvic exam, asks for medical history, and makes an assessment. During her examination of a victim, Coberly collects samples for the rape kit, including mouth, fingernail, and pelvic swabs, and collects the victim's clothing. Coberly confirmed that she examined V.F. at St. Charles on August 22, 2019. She described V.F. as "extremely tearful" with "bouts of crying" and "appear[ing] slightly disheveled."

{¶ 17} During the exam, V.F. recalled complaining of pain in her vaginal area and buttocks. Coberly confirmed that V.F. complained of vaginal pain and dryness, and added that V.F. reported pain on the back of her neck and a small bruise on her right

hand. V.F. admitted that the bruise could have come from other activities. Coberly did not find any visible bruising or observe any acute injuries during the pelvic exam. However, she noted that bruising may not appear right away, and that bruising (or lack thereof) is not determinative of pain. Although V.F. consented to Coberly taking photographs during the exam, Coberly ultimately did not take any photos because V.F. did not have any visible injuries for her to photograph.

{¶ 18} Hammett, the forensic scientist from BCI, testified that she conducted DNA analysis on the items that police seized as evidence in this case, V.F.'s rape kit, and Peacock's DNA standard sample, and prepared a report of her findings. Her analysis of the rape kit confirmed that DNA consistent with Peacock's was found in the rape kit. V.F.'s vaginal samples contained contributions from Peacock, but her oral samples did not contain any foreign DNA. Hammett explained that, as the time between the sexual contact and the time of taking an oral sample increases, the likelihood of the oral sample containing foreign DNA decreases. However, she said that a person ejaculating into the oral orifice would increase the likelihood of foreign DNA being present.

{¶ 19} Regarding the TPD's investigation, Kozlaker testified that V.F.'s distraught and scattered behavior on the scene was consistent with someone who had experienced trauma. Garrett explained that trauma affects individuals differently, and that a person might not communicate all of the information about an assault at one time because they might be hysterical, or they might not remember certain things at certain times. Ultimately, V.F's inebriated condition limited the officers' ability to conduct an on-site

interview. As a result, the detectives scheduled another interview with V.F. several weeks after the assault to obtain her official statement.

{¶ 20} V.F. testified that she obtained a protection order soon after the incident, but that Peacock continued to walk, bike, and drive past her home. Although V.F. and Peacock live in the same neighborhood, their houses are near different intersections, so she said it was possible for Peacock to respect the order. Despite that, V.F. claimed that Peacock continued to travel past her home, which intimidated her and made her fear for her safety.

{¶ 21} During the investigation, Peacock voluntarily cooperated with law enforcement. He gave a statement and voluntarily provided a DNA sample to the detectives on August 22, 2019. During the interview, Peacock told the detectives that he and V.F. had a consensual sexual relationship several years earlier for approximately one month. Peacock initially denied having sexual contact with V.F. the morning of the assault, but later characterized their interaction as consensual sex.

{¶ 22} According to the version of events that Peacock told the detectives, V.F. approached him on the street as he was walking home from his mother's house; she was not coming from her home, but was walking toward him from across the street. V.F. was grabbing at him and crying about Fuller losing the rent money. He thought that V.F. wanted him to beat up whoever stole their rent money, but he was not interested and dismissed her. Peacock confirmed that V.F. was noticeably drunk, that he was not intoxicated, and that he "could smell [alcohol] on her breath." After V.F. approached

him, Fuller called out to him to share his "blunt." So, he joined the group on the porch and they smoked the blunt.

{¶ 23} At Connie's behest, Peacock went into the house, and after walking around, he sat in a chair in the dining room, which was adjacent to V.F.'s bedroom. At this point, Peacock claimed that V.F. sat in his lap, rubbed his head (which he referred to as "his spot"), and then got on her knees, pulled out his penis, and attempted to perform oral sex on him.

{¶ 24} Peacock told V.F. that he was not interested in sex, and he got up to leave, but V.F. pushed him into the bedroom. In the bedroom, Peacock sat in an armchair by the bed. V.F. "got naked herself," jumped on the bed, and said "you don't want this/me?" He said that he did not and moved toward the door, but she pulled him by the back of his shirt and he fell onto the bed. Peacock claimed that V.F. did the rest: she got on top of him, pulled his pants down, and began vaginal intercourse. He said that no one else was in the bedroom at the time, and that V.F.'s grandson was sitting on the couch in the living room. Peacock claimed that, at some point, V.F. said, "I can't get one off, so you might as well finish/hit me from the back," and then he did. Peacock insisted that V.F. never said "stop" or "no," and that the sex lasted about ten minutes. He claimed that V.F.'s grandson only came into the bedroom when Peacock left the room, after they had sex. Afterward, Peacock went out to the front porch, asked for a cigarette, and told Fuller that her mom was in bed. Then Peacock left because his friend was waiting for him.

**{¶ 25}** The detectives testified to several inconsistencies in Peacock's statement about the type of sexual contact he had with V.F. As Garrett observed in his testimony:

> [I]n the beginning he would say that he didn't get hard. He didn't want it. And then he was saying he was sitting in the chair. He didn't get hard. That changed to he did get hard, and then not only did he get hard[,] she gave him a blow job. It changed from him being pushed into the room, that he followed her to the room. It changed from when he was sitting in the chair she pulled him in the bed. She got on top of him, and he wasn't hard[,] to he was hard. And it also changed to the point where he was saying well, he started hitting it from the back and he pulled her hair * * *. Another thing that was changed * * * he talked about pre-cum, and then he went to he nutted.

Further, Peacock first claimed that he never grabbed V.F. by her hair, pushed her head down, or choked her, but later, he admitted that when he was engaging in sex from behind, he grabbed her by the hair and shoved her into the bed.

**{¶ 26}** Kozlaker noticed similar inconsistencies in Peacock's story, along with other behavioral indicators:

> [His] statement was ever changing. At first * * * he never had an erection. He never ejaculated inside of [V.F.] He then changed it to she then performed oral sex on him, even at once biting him. She pulled him by the back of the shirt into the bedroom, and then it became she * * * led

him around the kitchen and through the other door into the bedroom so that he was not sitting on the chair as he first stated.  His actions during that interview, also, pulling his arms into his shirt, stating that he's willing to help old ladies cross the street.  He could get any woman that he wanted to.  Those are all red flags * * * he would always try to change the direction of the questioning with those statements.

By comparison, Kozlaker characterized V.F.'s statements as "consistent throughout."  As Kozlaker described it, V.F. will be the first to tell you that she's not perfect and she admitted to drug use, but she is a "straight shooter."

{¶ 27} Peacock did not call any witnesses.

{¶ 28} During closing arguments, Peacock questioned the quality and length of the police investigation, characterizing it as "far more by way of duration than intensity."  He also asserted that the time between the start of the investigation and his arrest—376 days—was improper and that Kozlaker took too long—200 days—to file her final supplemental report.

{¶ 29} In the state's rebuttal argument, to address Peacock's insinuations, the prosecutor said:

Ladies and gentlemen, the State representative is standing here in a mask in front of you.  You are all sitting here in a mask.  The Judge is in a mask.  Everybody is in a mask because we are in COVID.  Everything shut down.  Courthouses, T.V. show production stopped.  Movie theaters.

Nobody was going anywhere and noting [sic] was getting done.  That is a big reason for the delay in anything happening.

{¶ 30} Peacock objected to this comment on the basis that the state was asking the jury to consider information not in evidence and was implying that COVID-19 was the cause of prosecutorial delays without introducing any evidence to prove this point.  The court overruled this objection, finding that the pandemic was common knowledge, and that pandemic-related delays and shutdowns were widely known and regularly broadcast in the news.

{¶ 31} Based on this evidence, the jury found Peacock guilty of sexual battery and not guilty of rape.  Shortly thereafter, the court sentenced Peacock to 54 months in prison and lifetime registry as a sex offender.

{¶ 32} Peacock timely appeals and asserts the following errors for our review:

1. The Finding of Guilt was Against the Manifest Weight of Evidence For the Jury to Convict Appellant of Sexual Battery as the State Did Not Prove the Victim was Substantially Impaired Beyond a Reasonable Doubt[.]

2. The Trial Court Made Reversable [sic] Error when it Allowed Prosecutor to reference facts not in evidence during closing.

## II. Law and Analysis

### A. Peacock's conviction is supported by the manifest weight of the evidence.

{¶ 33} Peacock's first assignment of error asserts that his conviction of sexual battery was against the manifest weight of evidence because the state did not prove that V.F. was substantially impaired beyond a reasonable doubt. Peacock argues that (1) V.F. was upset about the burglary—not intoxicated to the point that she was substantially impaired—the morning of the incident, and (2) he did not know that V.F. was substantially impaired because he did not know that she had been drinking and using drugs.

{¶ 34} The state responds that it presented ample evidence showing that V.F. was substantially impaired and that Peacock knew of her impairment. The state points out that V.F., her daughter, an officer, and two detectives all testified that V.F. was intoxicated, that V.F. and her daughter testified to drinking and using drugs for hours before the assault, and Peacock himself admitted to smoking marijuana with V.F. shortly before the assault. The state contends that this shows that Peacock knew that V.F. was, in fact, substantially impaired, or alternatively, that there was a high probability of her impairment.

{¶ 35} In criminal appeals challenging the jury's verdict on manifest-weight grounds, the issue is whether the state met its burden of persuasion. *State v. Thompkins,* 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997) (Cook, J., concurring). "Weight is not a question of mathematics, but depends on its *effect in inducing belief*." (Emphasis sic and

internal quotation omitted.) *Id.* at 387. When an appellate court reviews a claim that a verdict is against the manifest weight of the evidence, we must "examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the jury '"clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 81, quoting *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). We do not view the evidence in a light most favorable to the prosecution. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15, quoting *Thompkins* at 387.

{¶ 36} Although we consider the credibility of witnesses under a manifest-weight standard, we extend special deference to the jury's credibility determinations, given that it is the jury that has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14. Reversal on manifest weight grounds is reserved for "'the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin* at 175.

{¶ 37} In relevant part, R.C. 2907.03(A)(2) specifies that a person commits sexual battery when he "engage[s] in sexual conduct with another, not the spouse of the offender

* * *" if "[t]he offender knows that the other person's ability to appraise the nature of or control the other person's own conduct is substantially impaired." The threshold issues presented by this statute are (1) whether the victim was "substantially impaired" when the defendant engaged in sexual conduct with her, and (2) whether the defendant knew of the victim's impairment at the time of the sexual act.

{¶ 38} Although the phrase "substantially impaired" is not defined in the Revised Code, the Ohio Supreme Court has determined that "substantial impairment must be established by demonstrating a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of [her] conduct or to control [her] conduct." *State v. Zeh*, 31 Ohio St.3d 99, 103-104, 509 N.E.2d 414 (1987); *State v. Hovatter*, 6th Dist. Sandusky No. S-21-006, 2022-Ohio-33, ¶ 17. Of course, not every instance of alcohol consumption or intoxication will rise to the level of substantial impairment. *State v. Harris*, 9th Dist. Summit No. 29583, 2020-Ohio-4365, ¶ 7, citing *State v. Hansing*, 2019-Ohio-739, 132 N.E.3d 252, ¶ 13 (9th Dist.). However, it is generally sufficient for the state to establish substantial impairment by showing a "'reduction or decrease in the victim's ability to act or think.'" *Hovatter* at ¶ 17, quoting *State v. Freeman*, 8th Dist. Cuyahoga No. 95511, 2011-Ohio-2663, ¶ 15. Further, the victim's testimony, standing alone, is sufficient to prove substantial impairment. *State v. Franklin*, 9th Dist. Summit No. 29071, 2019-Ohio-1513, ¶ 8.

{¶ 39} Under the definition of "knowingly" in R.C. 2901.22(B), a defendant "has knowledge of circumstances when [he] is aware that such circumstances probably exist."

A defendant's knowledge of a fact is established as an element of an offense when the state shows that he "subjectively believes that there is a high probability of [the fact's] existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact." *Id.* In sexual battery cases, a defendant's knowledge of the victim's substantial impairment is established when the defendant sees signs of the victim's overwhelming impairment—e.g., slurring words, stumbling, incontinence, or passing out—or is aware of the victim's activities contributing to her impairment—e.g., consuming alcohol with the victim or learning that the victim recently left a bar. *See State v. Holsey*, 8th Dist. Cuyahoga No. 96094, 2011-Ohio-4506, ¶ 11; *State v. Jarvis*, 9th Dist. Summit No. 25481, 2011-Ohio-4491, ¶ 11.

{¶ 40} Peacock first argues that the state failed to show that V.F. was substantially impaired. He points to evidence that V.F. was able to tell police what happened, and that the police did not think that V.F. was so intoxicated that they found her accusations unbelievable because they began their investigation of him that day, before V.F. provided her official statement. However, the record includes ample evidence showing that V.F. was substantially impaired.

{¶ 41} First, V.F. and Fuller both testified that V.F. was significantly impaired after consuming alcohol, marijuana, and cocaine over the span of a few hours that morning. They each said that V.F. consumed several drinks rapidly at the bar, and then continued drinking throughout the morning, to the point that V.F. was drunk. V.F.

testified, and Fuller confirmed, that V.F. also did two lines of poor-quality cocaine and smoked marijuana with Peacock.

{¶ 42} Second, the testimony and bodycam footage from the police, who arrived at the house shortly after the assault, confirmed V.F.'s level of intoxication, which was so significant that they could not take her official statement. For example, Garrett and Kozlaker described V.F.'s demeanor as "frantic," "hysterical," "noticeably intoxicated," "in disarray," and "just rambling about," and found the usefulness of their initial interview with V.F. to be "very limited due to her condition." Further, the bodycam footage shows that V.F. is visibly distressed, she says that she is drunk, and her behavior seems consistent with intoxication, as her recall is very scattered and she keeps repeating herself. The officers are heard repeating questions several times attempting to get clear answers from her.

{¶ 43} Finally, Peacock's statements to the police established that V.F. was highly intoxicated. Peacock admitted to smoking marijuana with V.F. immediately before the assault, declared several times in his statement that V.F. was intoxicated, said that V.F. was noticeably drunk, and said that he "could smell [alcohol] on her breath." He also said that he was not drunk.

{¶ 44} A victim's testimony—standing alone—is sufficient to prove substantial impairment. *See State v. Acosta*, 6th Dist. Lucas No. L-09-1120, 2010-Ohio-5166 (upholding defendant's conviction for sexual battery because the victim testified that she was intoxicated to the point of substantial impairment, despite defendant's claim that

some of the conduct did not occur, because it was within the jury's province to determine issues of credibility). Of course, a victim's testimony supported by corroborating testimony is even more persuasive. *See State v. Schwamberger*, 6th Dist. Lucas No. L-13-1236, 2014-Ohio-4733 (the victim's testimony, along with testimony from the victim's friends, who witnessed the victim's behavior and physical condition, was sufficient to support a conviction of sexual battery); *State v. Clyde*, 6th Dist. Erie No. E-14-006, 2015-Ohio-1859 (sufficient evidence supported sexual battery charge because the victim testified that defendant had sexual intercourse with her several times, and the victim's testimony was corroborated by her former girlfriend and defendant's former brother-in-law). Here, the state produced ample testimony to establish that V.F. was intoxicated to the point of having "a present reduction, diminution or decrease in [her] ability, either to appraise the nature of [her] conduct or to control [her] conduct"; the victim, her daughter, the police officers, and detectives—as well as Peacock himself—all confirmed that V.F. was under the influence of multiple intoxicating substances before the assault. *Zeh*, 31 Ohio St.3d at 103-104, 509 N.E.2d 414.

{¶ 45} Peacock also argues that he could not have known that V.F. was substantially impaired. We disagree. Indeed, Peacock's own words belie his claim. In his interview, Peacock described V.F.'s condition as "drunk," he admitted that he could smell alcohol on her breath, and he repeatedly said that V.F. was intoxicated. Peacock also conceded that he shared his "blunt" with V.F. right before the sexual conduct occurred, so he knew that V.F. also smoked marijuana immediately before the assault.

**{¶ 46}** Taken together, this evidence shows that Peacock knowingly engaged in sexual conduct with V.F. while V.F. was substantially impaired.

**{¶ 47}** In sum, Peacock's case is not an exceptional case in which the evidence weighs heavily against the conviction, and the jury did not lose its way or create a manifest miscarriage of justice by convicting Peacock of sexual battery. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. Therefore, Peacock's first assignment of error is not well-taken.

### B. The prosecutor did not engage in misconduct during closing arguments.

**{¶ 48}** In Peacock's second assignment of error, he argues that he was denied his right to a fair trial due to prosecutorial misconduct during closing argument. Peacock asserts that the prosecutor's reference to COVID-19 as the reason for procedural delays was an improper and reversible error.

**{¶ 49}** The state responds that the prosecutor has wide latitude during closing arguments, the prosecutor's statements in rebuttal were in response to Peacock's allegations of improper delays in the investigation, and the statements were not central to the case. The state contends that the prosecutor "merely 'reminded'" the jury of the pandemic and its detrimental effect on government institutions.

**{¶ 50}** To succeed on a prosecutorial misconduct claim, the defendant must prove that the prosecutor's conduct was improper and that it "prejudicially affected the defendant's substantial rights." *State v. Walker*, 1st Dist. Hamilton No. C-060910, 2007-Ohio-6337, ¶ 45, citing *State v. Smith*, 130 Ohio App.3d 360, 366, 720 N.E.2d 149 (1st

Dist.1998). "Generally, prosecutors are entitled to considerable latitude in opening and closing arguments." *State v. Boles,* 190 Ohio App.3d 431, 2010-Ohio-5503, 942 N.E.2d 417, ¶ 50 (6th Dist.), citing *State v. Ballew,* 76 Ohio St.3d 244, 255, 667 N.E.2d 369 (1996). During closing, a prosecutor may comment on what the evidence has shown and what reasonable inferences may be drawn from the evidence. *Id.* "'[I]solated incidents of prosecutorial misconduct are harmless, [thus] the closing argument must be viewed in its entirety to determine whether the defendant has been prejudiced." *Id.,* quoting *State v. Stevens,* 2d Dist. Montgomery No. 19572, 2003-Ohio-6249, ¶ 34.

{¶ 51} "[A] reversal for prosecutorial misconduct will not occur unless it is clear that the outcome of the trial would have been different but for the misconduct." *Boles* at ¶ 50, citing *State v. Smith*, 14 Ohio St.3d 13, 15, 470 N.E.2d 883 (1984). In other words, the defendant must show that, absent the prosecutor's comments, the jury would have found the defendant not guilty. "Important considerations are whether the misconduct was an isolated incident or a protracted series of improper arguments, whether the defendant objected, whether curative instructions were given, and whether the evidence of guilt was overwhelming." *State v. Oviedo*, 6th Dist. Lucas No. L-95-287, 1997 WL 525087, *2 (Aug. 15, 1997), citing *State v. Keenan*, 66 Ohio St.3d 402, 410, 613 N.E.2d 203 (1993). This remedy is typically reserved for egregious and flagrant misconduct, for instance, where a prosecutor "express[es] his personal belief or opinion as to the credibility of a witness or as to the guilt of the accused[,] * * * make[s] unfair or

derogatory personal reference to opposing counsel[,]" or draws inferences from facts not in evidence. (Internal quotation omitted.) *Smith* at 14.

{¶ 52} Throughout the trial, Peacock speculated about delays in the investigation and his arrest. Specifically, in his closing argument, Peacock implied that the police acted nefariously by taking too long—376 days and 200 days, respectively—to arrest him after his interview with them and to file their final supplemental report. In rebuttal, the prosecutor said:

Ladies and gentlemen, the State representative is standing here in a mask in front of you. You are all sitting here in a mask. The Judge is in a mask. Everybody is in a mask because we are in COVID. Everything shut down. Courthouses, T.V. show production stopped. Movie theaters. Nobody was going anywhere and noting [sic] was getting done. That is a big reason for the delay in anything happening.

In overruling Peacock's objection to the prosecutor's statements, the court emphasized that the COVID pandemic was common, worldwide knowledge, the pandemic was widely broadcast in news media, and citizens were well aware of pandemic-related shutdowns.

{¶ 53} In our review, we recognize that this trial took place during the COVID-19 pandemic, and the trial court directly addressed the jury several times on COVID-19 safety procedures. In fact, the trial judge gave a lengthy explanation of the court's COVID-19 procedures, including masking and social distancing, and screened jurors for

potential COVID-19 exposure during voir dire. Thus, we agree that COVID-19 was a matter of common knowledge, and we find no error in the prosecutor calling attention to its impact.

{¶ 54} Assuming that the prosecutor's comments were improper, Peacock must show that the comments were outcome-determinative—i.e., absent the prosecutor's comments, the jury would have found him not guilty—and Peacock does not attempt to argue that he was prejudiced by the prosecutor's comment. *Boles*, 190 Ohio App.3d 431, 2010-Ohio-5503, 942 N.E.2d 417, at ¶ 50. Further, the prosecutor's comments about COVID-19 causing delays were not crucial to the case. Assessing the prosecutor's closing argument in its entirety, it is clear that this was an isolated incident, and notwithstanding this comment, the evidence of Peacock's guilt was substantial. Therefore, we find that Peacock's second assignment of error is not well-taken.

### IV. Conclusion

{¶ 55} Considering the persuasiveness of the evidence presented at trial, we cannot say that the jury clearly lost its way or created a manifest miscarriage of justice by finding Peacock guilty of sexual battery. Nor can we say that the prosecutor's comments about COVID-19 delays during closing argument were consequential enough to be injurious or outcome-determinative, and Peacock does not argue that he was prejudiced by the prosecutor's comments. Accordingly, we find that Peacock was not prejudiced or prevented from having a fair trial, and we affirm the October 27, 2021 judgment of the

Lucas County Court of Common Pleas. Peacock is ordered to pay the costs of this appeal

pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.      _____

Christine E. Mayle, J.                JUDGE

Myron C. Duhart, P.J.            _____
CONCUR.                               JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.